633 F.2d 384
 Paul Allen COLES, Plaintiff,
and
Sylvia Coleman, R. Kent Willis, and on behalf of all others
similarly situated, and Housing Opportunities Made
Equal, a Virginia Corporation, Appellants,
v.
HAVENS REALTY CORPORATION, a Virginia Corporation, and Rose
Jones, Appellees.
 No. 79-1199.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 10, 1980.
Decided Sept. 18, 1980.
 
 Vanessa Ruiz, Washington, D. C. (Daniel M. Singer, Theodore C. Hirt, Dennis J. Riley, Josephine L. Ursini, Raymond E. Mabus, Jr., Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., James F. Stutts, McSweeney & Stutts, Richmond, Va., on brief), for appellants.
 Richard W. Hogan, Richmond, Va. (Linda L. Royster, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., on brief), for appellees.
 Before FIELD, Senior Circuit Judge, and HALL and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This is an appeal from a final judgment of the district court granting defendants' motion to dismiss an action involving allegations of "racial steering" and racial discrimination in the rental of housing accommodations in the City of Richmond and Henrico County, Virginia. "Racial steering" is a practice by which real estate brokers and agents preserve and encourage patterns of racial segregation by steering members of racial and ethnic groups to buildings occupied primarily by members of their own racial or ethnic group and away from buildings and neighborhoods inhabited by members of other races or groups.
 
 
 2
 This suit was brought under the Fair Housing Act of 1968, 42 U.S.C. §§ 3601, 3604, 3612(a) (hereafter Fair Housing Act) and the Civil Rights Act of 1866, 42 U.S.C. § 1982. The district court dismissed all the claims except that of a single plaintiff, Paul Allen Coles. It held that the other claims were time-barred by the 180-day limitation period of the Fair Housing Act, and that the other plaintiffs lacked standing to assert discrimination claims under either statute. After a careful review of the law, we conclude that all plaintiffs have standing under the Fair Housing Act and that their claims are not time-barred. We therefore reverse and remand for further proceedings. We do not reach the questions of standing under 42 U.S.C. § 1982.
 
 
 3
 The corporate plaintiff in this action is Housing Opportunities Made Equal (HOME). HOME is a Virginia nonprofit corporation with about 600 members created for the purpose of eliminating unlawful, discriminatory housing practices, thereby seeking to make equal opportunity in housing a reality in the Richmond Metropolitan Area. HOME activities include: assisting individuals of all races in obtaining housing in the metropolitan area through the operation of a housing counseling service; investigating allegations of discrimination and referring complaints to appropriate federal and state authorities; conducting independent investigations of real estate brokers located in the metropolitan area to determine whether housing is being made available without regard to race; and taking appropriate steps to eliminate any racial discriminatory housing practices it may have found to exist.
 
 
 4
 The three individual plaintiffs, a "renter" and two "testers", reside in the City of Richmond or Henrico County. Paul Allen Coles, a black person, unsuccessfully sought to rent housing accommodations from the defendants. The two "tester" plaintiffs, Sylvia Coleman, a black person, and R. Kent Willis, a white person, contacted defendants in regard to the availability of rental apartments in the course of their employment with HOME to determine whether defendants were practicing racial steering. Corporate defendant is Havens Realty Corporation (Havens), which is in the business of providing real estate brokerage services for rental apartment units in Richmond. The remaining defendant is Rose Jones, a Havens employee.
 
 
 5
 The factual allegations in the complaint must be accepted as true in the present posture of the case.[1] So construed, the complaint reflects the following facts relevant to the disposition of this appeal.
 
 
 6
 An unnamed black tester on March 14, 1978, inquired about rental vacancies at Havens and was told by Rose Jones that nothing was available. Later that day Willis, the white tester, asked about vacancies and was told by Jones that apartments were available at Colonial Court and Camelot Townhouses. Colonial Court is integrated and Camelot Townhouse is predominately occupied by whites. A week later on March 21, 1978, black tester Sylvia Coleman asked generally about vacancies in apartments in Henrico County and was informed by one of Havens' employees that nothing was available, although the same day white tester R. Kent Willis was informed by Jones that there was an apartment at Colonial Court. Two days later, on March 23, 1978, black tester Coleman again asked Jones about vacancies and was told that nothing was available. White tester Willis was informed that day by Jones that an apartment was available at Colonial Court. On July 6, 1978, black tester Coleman asked specifically about Camelot Townhouses and again received a negative response, but she was told about a vacancy at Colonial Court. That same day white tester John Barr, upon inquiry, was told an apartment was available at Camelot Townhouses.
 
 
 7
 Coles visited Havens' offices on July 13, 1978, inquiring into the availability of apartments at Camelot Townhouses. He was informed there were no vacancies at Camelot but that an apartment was available in the adjoining integrated Colonial Court complex. The same day John Barr, a white tester, was informed by Rose Jones telephonically that an apartment was available at Camelot Townhouses-upon visiting the defendant's offices Barr was again informed that an apartment was available in the Camelot Townhouses.
 
 
 8
 The plaintiffs filed this action on January 9, 1979, individually and as a class action. The class included all persons who have rented or sought to rent residential property in Henrico County, Virginia, and who are adversely affected by the defendants' discriminatory acts, policies and practices. They seek declaratory and injunctive relief for the class, as well as an order requiring Havens to take various affirmative actions to overcome the effect of its past discriminatory actions. The individual plaintiffs, in addition, seek compensatory and punitive damages. HOME asks for its activity and litigation expenses.
 
 
 9
 Plaintiffs allege that the Richmond Metropolitan Area, including Henrico County, is racially segregated in its housing patterns; that is, it contains identifiable "white" and "black" neighborhoods; that the defendants' practices of racial steering contribute to the maintenance of existing neighborhood segregation and inhibit the development of stable, racially integrated neighborhoods; that defendants treat white and non-white prospective lessees differently based on their race or color; that defendants have engaged in practices to the detriment and injury of the plaintiffs and other similarly situated persons by consistently showing only prospective white customers rental units in buildings occupied primarily by white tenants, by consistently refusing or failing to show black prospective customers rental units in buildings occupied primarily by white tenants, and, on occasion, by failing or refusing to show prospective black customers rental units in less racially segregated buildings.
 
 
 10
 The complaint alleges that tester plaintiff Coleman (because of her race) and white tester Willis have been denied the right to rent real property in Henrico County and therefore have been deprived of the advantages and conveniences they would have enjoyed from living in this area, namely the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices.
 
 
 11
 It is also alleged that all the members of the class have been deprived of the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices, in violation of the Fair Housing Act.
 
 
 12
 The complaint alleges that HOME has had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices; and that HOME members have, as a result of defendants' practices, been deprived of the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices in violation of the Fair Housing Act.
 
 STANDING
 
 13
 All plaintiffs have standing. Willis and Coleman have standing as testers but, even if this were not so, they have alleged sufficient personal harm to give them standing. HOME has Article III standing both as a representative of its members and on the basis of its allegations of harm to the corporation.
 
 
 14
 * TESTERS
 
 
 15
 The question of standing for testers under the Fair Housing Act was left unanswered by the Supreme Court in its seminal pronouncement on Fair Housing Act standing in Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). The involvement of Willis and Coleman and their treatment by the defendants, however, presents strong public policy reasons for resolving that question in favor of Fair Housing Act standing for bona fide testers. The basic appropriateness of affording them standing to litigate today's issues of fair housing parallels the importance of the right to litigate the crucial issues decided in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958). There are, of course, distinctions in the cases, but the binding similarity is that they all treat the right of testers to challenge actions frustrating vital public policy where in most instances no other effective challenge could be mounted. The testers in Pierson actively sought integrated admission to the "whites only" section of the bus station; in Evers they occupied seats in the forbidden section of the bus. While the testers here only inquired about apartment rentals and did not apply to rent an apartment, their actions serve the same fundamental purposes as the testers' in Pierson and Evers. Willis and Coleman purposefully approached the defendants as the first step in eradicating racial discrimination in housing, a social evil so antithetical to a free and democratic society that Congress has devised special and sharp tools for its excision. Housing, as a personal choice right of a citizen, is no less important than other rights affecting human dignity, such as unfettered access to public facilities. In Evers the Court wrote per curiam:
 
 
 16
 A resident of a municipality who cannot use transportation facilities therein without being subjected by statute to special disabilities necessarily has, we think, a substantial, immediate, and real interest in the validity of the statute which imposes the disability. (Citation omitted.) That the appellant may have boarded this particular bus for the purpose of instituting this litigation is not significant. (Citations omitted.)
 
 
 17
 Id. at 204, 79 S.Ct. at 179.
 
 
 18
 In Pierson, a group of clergymen traveled to Jackson, Mississippi, for the sole purpose of testing their rights to unsegregated public accommodations. The Court said, "(t)he petitioners had the right to use the waiting room of the Jackson bus terminal, and their deliberate exercise of that right in a peaceful, orderly, and inoffensive manner does not disqualify them from seeking damages under section 1983." 386 U.S. at 558, 87 S.Ct. at 1220 (footnote omitted).
 
 
 19
 In Pierson and Evers the Court said in effect that since the plaintiffs were not representing injuries to third parties, but rather to themselves, there was no issue of prudential limitations. Here Willis and Coleman, in their capacity as employed testers, unquestionably assert the rights of third parties. As explained in Warth[2], however, Congress eliminated prudential considerations in Fair Housing Act cases, intending that standing be allowed as broadly as constitutionally permitted by Article III. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979); Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972).
 
 
 20
 The breadth of Congressional protection against housing discrimination is apparent from the language of section 3604(d), 42 U.S.C. § 3604(d), which makes it unlawful "(t)o represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." This prohibition against providing false information creates a concomitant right to receive correct housing information without regard to race or color. Individuals illegally denied housing by subterfuge are, by the nature of the wrongful act, less able than others in our society to require enforcement of the Civil Rights Act through private litigation as "private attorneys general". There is no rational reason why their bona fide surrogates cannot pursue their cause. If the defendants had supplied the testers truthful information-that apartments were available both in Colonial Court and Camelot Townhouses-there would have been no injury and the social reform legislated by Congress would have been advanced without resort to the courts.
 
 
 21
 It is not necessary to formulate a general rule circumscribing standing for tester plaintiffs. Suffice it to say that they occupy a narrow island limited to areas fundamentally necessary for access to the federal courts as presented by Pierson and Evers or, as here, where Congress has recognized a similar deeply-grounded human right. The legislative design of the Fair Housing Act provides such broad standing for enforcement of the right. This is consistent with the Trafficante and Bellwood interpretation of the Fair Housing Act-maintaining the prophylactic quality of Article III limitations while recognizing the elasticity necessary to accommodate constitutional Congressional intent.
 
 II
 
 22
 DIRECT INJURY TO "TESTERS"
 
 
 23
 Coleman and Willis also alleged violations of their right to enjoy the fruits of an integrated community in much the same language as the individual plaintiffs in Trafficante and Bellwood. This similarity gives weight to their status as bona fide "testers". These allegations, moreover, are sufficient to grant standing for each of them as individual plaintiffs.
 
 
 24
 The Supreme Court in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), discussing an alleged violation of 42 U.S.C. § 1981, stated:
 
 
 25
 We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the courts' intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review" or that relief can be framed "no broader than required by the precise facts to which the court's ruling would be applied."
 
 
 26
 Id. at 508, 95 S.Ct. at 2210.
 
 
 27
 The Warth opinion indicated a reservation as to whether the same ruling would have applied to a Fair Housing Act case.[3] Trafficante and Bellwood, however, decided standing under Fair Housing Act principles. Coleman and Willis both claim deprivation of community rights in language at least as specific as approved there. They are residents of Henrico County included within the Richmond Metropolitan Area. They claim the practice of racial steering has adversely affected the area in which they live and that the defendants have engaged in racial steering. Black tester Coleman claims she has been denied the right to rent property and to make and enforce contracts for the lease of real estate in Henrico County by defendants' action; has been deprived of the advantages and conveniences she would have enjoyed from living in the area; and has been deprived of the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices. White tester Willis claims he has been deprived of the same rights afforded by integrated communities. Both Coleman and Willis claim they have been subjected to a "dual" housing market in Henrico County on the basis of race or color by defendants' practices.
 
 
 28
 Housing discrimination injuries are not inflicted so neatly that the wounded can always be identified as individuals, representatives of individuals, or members of a community. The Supreme Court's expressions on standing thus are not rigidly compartmentalized as governing exclusively those directly injured, testers, or members of the community.
 
 
 29
 In Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 208, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972), one black and one white tenant of an apartment complex complained of discriminatory rental practices, alleging:
 
 
 30
 (1) they had lost the social benefits of living in an integrated community; (2) they had missed business and professional advantages which would have accrued if they had lived with members of minority groups; (3) they had suffered embarrassment and economic damage in social, business, and professional activities from being "stigmatized" as residents of a "white ghetto" (footnote omitted).
 
 
 31
 The Court held plaintiffs were persons "aggrieved" as defined in section 810(a) of the Fair Housing Act, i. e., any person who claims to have been injured by a discriminatory housing practice. In this context Justice Douglas said:
 
 
 32
 The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, as Senator Javits said in supporting the bill, "the whole community," 114 Cong.Rec. 2706, and as Senator Mondale who drafted § 810(a) said, the reach of the proposed law was to replace the ghettos "by truly integrated and balanced living patterns."
 
 
 33
 Id. at 211, 93 S.Ct. at 368.
 
 
 34
 In Bellwood four white plaintiffs, who were residents of the target area of Bellwood, alleged that discriminatory housing practices deprived them of "the social and professional benefits of living in an integrated society." 441 U.S. at 111, 99 S.Ct. at 1606. The Court noted the allegation was similar to that in Trafficante, where it was held that the injury alleged was sufficient to satisfy the constitutional standing requirement of actual or threatened harm. The broad definition of "person aggrieved" under section 810 of the Fair Housing Act was considered a clear indication of Congressional intent to permit liberal standing. The Court considered this to be a part of the scheme of the Act to encourage enforcement by complaints from private persons or "private attorneys general" which are "the main generating force" in "vindicating a policy that Congress considered to be of the highest priority." The "private attorneys general" role under the Civil Rights Act of 1968 serves not only to protect "those against whom a discrimination is directed but also those whose" daily lives are affected. Trafficante, 409 U.S. 211, 93 S.Ct. at 367.
 
 
 35
 We have neither the power nor the desire to minimize the "case and controversy" requirements of Article III. The modern decisions have not. The constitutional inquiry necessary in confining litigation to proper parties over appropriate disputes remains as generally stated in Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1974), citing Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."
 
 III
 ORGANIZATIONAL STANDING
 
 36
 The plaintiff HOME claims its members have been deprived of community advantages by defendants' actions in the same language utilized by Coleman and Willis. HOME therefore has representational standing to litigate these claims on behalf of its members.[4] Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), summarizes the requirements of representational standing where the organizational plaintiff has not itself suffered injury:
 
 
 37
 (W)e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.
 
 
 38
 Id. at 343, 97 S.Ct. at 2441.
 
 
 39
 See also Warth, 422 U.S. at 511, 95 S.Ct. at 2211, wherein the Court said:
 
 
 40
 Even in the absence of injury to itself, an association may have standing solely as the representative of its members . . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.
 
 
 41
 The complaint also alleges sufficient injury to HOME as an entity to confer standing on it directly. It claims HOME has been frustrated in its efforts to assist equal access to housing through counseling and other referral services. HOME has devoted significant resources identifying and counteracting the defendants' racially discriminatory steering practices.
 
 
 42
 This is more than the protestations of general interest found to be insufficient for standing in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and Warth, supra, and by the court of appeals in Village of Bellwood v. Gladstone Realtors, 569 F.2d 1013, 1017 (1978). Although not equaling, it approaches the injury suffered by the nonprofit developer in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). See also Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972); Heights Community Congress v. Rosenblatt Realty, Inc., 73 F.R.D. 1 (N.D.Ohio 1975). In Arlington Heights the Court said:
 
 
 43
 MHDC is a nonprofit corporation. Its interest in building Lincoln Green stems not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce. This is not mere abstract concern about a problem of general interest. See Sierra Club v. Morton, supra, (405 U.S.) at 739, (92 S.Ct. at 1368.) The specific project MHDC intends to build, whether or not it will generate profits, provides that "essential dimension of specificity" that informs judicial decisionmaking. Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).
 
 
 44
 429 U.S. at 263, 97 S.Ct. at 562.
 
 
 45
 Although HOME's goals cannot be equated with bricks and mortar, they are functional, requiring identifiable action and the expenditure of effort and funds which may result in success or failure in achieving its objectives. Its "projects" therefore "provides that 'essential dimension of specificity' that informs judicial decision making," as described in Arlington Heights.
 
 IV
 THE TARGET AREA
 
 46
 The defendants in oral argument contended that the City of Richmond or Henrico County is too large[5] as a matter of law to comprise a "target area" of housing discrimination. The "target area" in Trafficante was an apartment complex of 8,200 tenants, while the population of Bellwood in which the target neighborhood was located was estimated at 20,969. Gladstone, Realtors v. Bellwood, 441 U.S. at 113 n. 27, 99 S.Ct. at 1615 n.27. As the Court said in Bellwood, however:
 
 
 47
 The constitutional limits of respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in terms of city blocks rather than apartment buildings. Rather, they are determined by the presence or absence of a "distinct and palpable injury," Warth v. Seldin, 422 U.S., at 501, (95 S.Ct. at 2206,) to respondents resulting from petitioners' conduct. A "neighborhood" whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident. The presence of a genuine injury should be ascertainable on the basis of discrete facts presented at trial.
 
 
 48
 Id. at 114, 99 S.Ct. at 1615. (footnote omitted).
 
 
 49
 The district court's dismissal prevented plaintiffs Coleman, Willis, and HOME from proceeding to trial. Since allegations bearing on standing must be actualized by proof, the defendants may, on remand, contest these as any other facts. The complaint in the instant case does not specifically allege that the discrimination practiced at Colonial Court and Camelot Townhouses affect the area where the testers reside. The district court may require the complaint to be amended for such allegation necessary to facilitate production of evidence bearing on this issue. If the allegations are not supported by proof at trial, the case may be terminated for lack of standing at an appropriate stage of the trial. See Bellwood, 441 U.S. at 115 n. 31, 99 S.Ct. at 1616 n. 31.
 
 V
 STATUTE OF LIMITATION
 
 50
 The defendants contend, and the district court held, that all the alleged Fair Housing Act violations except the one of July 13, 1978, involving Coles are time-barred by the statute of limitation contained in 42 U.S.C. § 3612(a). The applicable part of that statute states simply: "A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred."
 
 
 51
 It is conceded that each of the specific acts of the defendants except the one of July 13 transpired more than 180 days before the complaint was filed. The defendants contend that each discrete act constitutes an "occurrence" and an action is barred as to each specific act after 180 days. The plaintiffs contend that the "occurrence" is the defendants' continuing practice of racial steering and that the 180 days commences with the last act-in this case the violation of July 13. We agree with the plaintiffs and hold that none of the allegations in the complaint are time-barred by the 180-day provision.
 
 
 52
 Hickman v. Fincher, 483 F.2d 855 (4th Cir. 1973), affirmed a district court ruling that barred an action commenced more than 180 days after the last act of discrimination. Hickman, however, is not dispositive because there was no allegation of a continuing violation or a pattern of violations.
 
 
 53
 There is an appealing simplicity equating "occurrence" to a discrete act. Not simple, however, are the social ills targeted by Congress or the actions of putative landlords. It is not isolated instances of discrimination that are the primary focus of the statute-rather it is a generalized practice of housing discrimination.
 
 
 54
 The Court of Appeals for the Seventh Circuit considered a similar contention in Baker v. F & F Investment, 420 F.2d 1191 (7th Cir. 1970). Negro purchasers of real estate on installment contracts alleged they were burdened with discriminatory prices and terms. The defendants there argued that they had performed only a single action-the execution of the contract-and that this was time-barred. The court disagreed, holding the violations continued during the lives of the contracts:
 
 
 55
 Plaintiffs have alleged wrongs committed by defendants which continue during the entire lives of the individual purchase contracts. They have alleged a conspiracy among defendants, the object of which was the establishment of a continuing relationship with individual plaintiffs. . . . Because of the continuing nature of the overt acts alleged, the statutes of limitations do not commence to run when the contracts were executed but when they terminate.
 
 
 56
 ...(T)he touchstone of our inquiry must be the nature and extent of defendants' behavior, not the duration of plaintiff's injury.
 
 
 57
 Id. at 1200 (citation omitted).
 
 
 58
 See Cedeck v. Hamiltonian Federal Savings & Loan Association, 551 F.2d 1136 (8th Cir. 1977) and Macklin v. Spector Freight Systems, Inc., 478 F.2d 979 (D.C. Cir. 1973). See also Fair Housing Council of Bergen County, Inc. v. Eastern Bergen County Multiple Listing Service, Inc., 422 F.Supp. 1071, 1078 (D.N.J.1976) where the district court said, in considering the section 3612(a) time limitation:
 
 
 59
 Congress obviously included such a provision to prevent the district courts from being used to exhume stale grievances. No such considerations apply to the case at bar. Plaintiffs have alleged what amounts to a continuing conspiratorial practice on the part of multiple, influential defendants. Taking the complaint as true, as is required at this early juncture, plaintiffs' grievance is anything but stale. It is fresh and immediate.
 
 
 60
 See Stingley v. City of Lincoln Park, 429 F.Supp. 1379 (E.D.Mich.1977).
 
 
 61
 The Sixth Circuit in Hunter v. Atchinson, 466 F.2d 490 (6th Cir. 1972), held that the facts of a given case would determine whether the language of section 3612(a) means the statute runs from the first or the last of the discriminatory acts. That opinion reversed the district court's dismissal and remanded for an evidentiary hearing noting "(t)his case may ultimately require us to construe the Congressional purpose involved in the limitation . . . ." Id. at 491.
 
 
 62
 There is no reason to differentiate the purpose of the section 3612(a) statute of limitation from general statutes barring litigation after a lapse of time. Lawmakers protect litigants from perpetual threats of lawsuits and protect the integrity of enlightened fact-finding. These policies do not militate against our holding. The instant controversy was continuing-the evidence easily obtainable. It is not unfair to require these defendants to litigate the matter when they were, according to the complaint, acutely aware of their continuing activities. Coles, Coleman, Willis and HOME were involved in active, consecutive, connected, and continuing attempts to secure or determine compliance with the Fair Housing Act. The defendants, just as resolutely, continued their practice of prohibited discrimination against these specific individuals. This, under the circumstances, is a continued relationship between the defendants and the plaintiffs and a continued violation of section 3604 so that the violations continued to "occur" until the last act of July 13, 1978. By the very nature of these offenses, "occurrence" must be thus construed to effect the remedial purposes of the Act.
 
 
 63
 REVERSED AND REMANDED.
 
 
 
 [1]
 Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)
 
 
 [2]
 Id. 422 U.S. at 509-10, 95 S.Ct. at 2210
 
 
 [3]
 Id. at 513 n. 21, 95 S.Ct. at 2212 n.12
 
 
 [4]
 It however can not represent its members in individual claims for damages where both the fact and extent of injury would require individualized proof. Warth, 422 U.S. at 511, 515-16, 95 S.Ct. at 2211, 2213
 
 
 [5]
 The population of the City of Richmond is 219,883 while that of Henrico County, Virginia is 172,922. Department of Commerce, Bureau of Census, Current Population Reports, Special Census of the Richmond, Virginia areas, April 4, 1978, p. 1, published August, 1979