**Celia and Enrique ESPINOZA, et al., Plaintiffs,**

v.

**HILLWOOD SQUARE MUTUAL ASSOCIATION, et al., Defendants.**

Civ. A. No. 81-0303-A.

United States District Court,
E. D. Virginia,
Alexandria Division.

Sept. 16, 1981.

Bradley S. Stetler, Norman A. Townsend, Graber, Stetler & Townsend, Alexandria, Va., for plaintiffs Espinozas.

Robert S. Blacher, Terris & Sunderland, Washington, D. C., for plaintiffs Espinozas and Rajpal.

Brian P. Gettings, Mark D. Cummings, Cohen, Gettings & Sher, Arlington, Va., for defendants Hillwood Square and Joan Fling.

### MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter comes before the court on the plaintiffs' joint motion for partial summary judgment under Rule 56(a). *See* Fed. R.Civ.P. 56(a). The plaintiffs contend that no material issues of fact remain with respect to their section 1981 claims. *See* 42 U.S.C. § 1981 (1976). They, therefore, move for summary judgment on the liability issue of that portion of their suit. The defendants have countered with a joint motion under Rule 12(b)(6) to dismiss the plaintiffs'

Fair Housing Act allegations for failure to state a cognizable claim. *See* Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the court denies both the plaintiffs' summary judgment motion and the defendants' dismissal motion.

### I. STATEMENT OF FACTS

Defendant Hillwood Square Mutual Association (Hillwood) is a cooperative housing association incorporated in Virginia. It owns and manages a townhouse subdivision in Falls Church, Virginia. The residents of Hillwood's subdivision do not own the townhouses in which they live. They, instead, are members of the association, which in turn owns all of the dwelling units. Each member is entitled to perpetual use of a townhouse in accordance with a contract between the member and Hillwood. Since 1977, the association has maintained a policy of refusing membership to aliens. *See* Minutes of Special Meeting of Board of Directors, Hillwood Square Mutual Association, September 12, 1977, at 1. At all relevant times, defendant Joan Fling has been the manager of Hillwood's subdivision.

Celia and Enrique Espinoza, alien residents of the United States, attempted to apply for membership in Hillwood on April 7, 1980. Fling denied them an application. A few days later, Fling again refused to give the Espinozas an application. On April 19, 1980, the Espinozas filed a complaint with the Human Rights Commission of Fairfax County, Virginia. In that complaint, they alleged that Hillwood had denied them membership because of their citizenship.

Vinod Rajpal, an alien resident of the United States, first attempted to become a member of Hillwood on June 25, 1980. At that time, Fling allegedly told him that he could not become a member due to his foreign citizenship. Hillwood subsequently denied membership to Rajpal on three more occasions. These refusals occurred on October 16, 1980, December 10, 1980, and February 12, 1981.

On April 6, 1981, the Espinozas and Rajpal filed suit against Hillwood in this court. The plaintiffs claim that Hillwood's citizenship policy violates both section 1981, 42 U.S.C. § 1981 (1976), and the Fair Housing Act, *id.* §§ 3601–3619. In particular, they allege that Hillwood's conduct constitutes discrimination on the basis of alienage and national origin. *See id.* §§ 1981, 3604(a). The plaintiffs contend that their suit qualifies as a class action. *See* Fed.R.Civ.P. 23. They seek both injunctive relief and damages.

On July 31, 1981, the Espinozas and Rajpal moved under Rule 56(a) for partial summary judgment on their section 1981 claims. They argue that no factual issues material to these claims remain unresolved. They ask the court to hold as a matter of law that the association's citizenship policy violates section 1981. Hillwood has responded with two allegations: first, it contends that it denied membership to Rajpal for reasons unrelated to his citizenship; and, second, it argues that the Espinozas had no basis for applying for membership, because they had not entered into a valid contract to purchase a townhouse.

On August 11, 1981, Hillwood countered with a motion to dismiss the plaintiffs' Fair Housing Act claims under Rule 12(b)(6). The association argues that the 180-day limitation period of section 3612(a) bars these claims. *See* 42 U.S.C. § 3612(a) (1976). In addition, it contends that an allegation of alienage discrimination fails to state a cognizable claim under the Fair Housing Act.

## II. THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THEIR SECTION 1981 CLAIM

██ The plaintiffs' summary judgment motion presents the issue of whether section 1981 reaches private discrimination based on citizenship. The court holds that an allegation of such discrimination does state a viable claim under section 1981. The court, however, must deny the plaintiffs' motion, because material factual issues remain unresolved.

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (1976). In *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court held that this section reaches purely private acts of racial discrimination. *See id.* at 168–72, 96 S.Ct. at 2593–95. While the court has ruled that section 1981 also prohibits alienage discrimination involving state action, *see Takahashi v. Fish & Game Commission*, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948), the courts are divided on the issue of whether the section applies to purely private alienage discrimination. The Fifth Circuit and several district courts have held that the section does encompass such private discrimination. *See, e. g., Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974); *Ortega v. Merit Insurance Co.*, 433 F.Supp. 135 (N.D.Ill.1977). One district court, however, has ruled that the legislative history requires a contrary conclusion. *DeMalherbe v. International Union of Elevator Constructors*, 438 F.Supp. 1121 (N.D.Cal.1977).

Section 1981 is derived from section 1 of the Civil Rights Act of 1866 (1866 Act) and section 16 of the Civil Rights Act of 1870 (1870 Act). Section 1 of the 1866 Act provided:

> That all persons born in the United States and not subject to any foreign power ... are hereby declared to be citizens of the United States; and such citizens, of every race and color, ... shall have the same right ... to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens ....

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27. This section was passed under section 2 of the thirteenth amendment to eliminate the badges and incidents of slavery. It applied only to discrimination based upon race. *See Runyon v. McCrary,* 427 U.S. at 168–72, 96 S.Ct. at 2593–95.

In 1869, Senator Stewart of Nevada initiated legislation to extend the protection of the 1866 Act to aliens. He first introduced the following resolution, which the Senate unanimously approved on December 6, 1869:

> *Resolved,* That the Committee on the Judiciary be requested to inquire if any States are denying to any class of persons within their jurisdiction the equal protection of the law, in violation of treaty obligations with foreign nations and of section one of the fourteenth amendment to the Constitution, and if so, what legislation is necessary to enforce such treaty obligations and such amendment, and to report by bill or otherwise.

Cong. Globe, 41st Cong., 2d Sess. 3 (1869). On January 10, 1870, Stewart introduced S. 365.[1] *See id.* at 323 (1870). In February, 1870, he moved for consideration of the bill and explained its relationship to section 1 of the 1866 Act:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have the equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States. That is all there is in the bill.

*Id.* at 1536.

On May 16, 1870, when the Senate commenced debate on S. 810, a bill to enforce the voting rights secured by the fifteenth amendment, Stewart offered S. 365 as an amendment. *See id.* at 3480. After the House passed H.R. 1293, a voting rights bill similar to S. 810, the Senate took up H.R. 1293 rather than S. 810. H.R. 1293 did not contain a provision equivalent to S. 365, so Stewart offered S. 810, with his amendment, as a substitute. *See id.* at 3561. On May 20, 1870, Senator Stewart explained the purpose of his amendment to S. 810:

> We are inviting to our shores, or allowing them to come, Asiatics. We have got a treaty allowing them to come . . . . While they are here I say it is our duty to protect them . . . . It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see that they have the equal protection of the laws, notwithstanding that they are aliens. They, or any other aliens, who may come here are entitled to that pro-

---

1. As proposed, S. 365 provided:

   *Be it enacted, etc.,* That all persons within the jurisdiction of the United States, Indians not taxed excepted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating to such State from any other foreign country, and any law of any State in conflict with this provision is hereby declared null and void.

   Sec. 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

   Sec. 3. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted, and said act, except the first and second sections thereof, is hereby referred to and made a part of this act.

   Cong. Globe, 41st Cong., 2d Sess. 323 (1870).

tection. If the State courts do not give them the equal protection of the law, if public sentiment is so inhuman as to rob them of their ordinary civil rights, I say I would be less than [a] man if I did not insist, and I do here insist that that provision shall go on this bill; and that the pledge of this nation shall be redeemed, that we will protect Chinese aliens or any other aliens whom we allow to come here
. . . .

*Id.* at 3658.

The Senate passed H.R. 1293 as amended by Stewart's substitute. *See id.* at 3690. A conference was held to reconcile the differences in the Senate and House bills. It recommended adoption of Stewart's substitute without significant change. *See id.* at 3752. The Senate approved the conference report on May 25, 1870. *See id.* at 3809. The House approved the conference report on May 27, 1870. *See id.* at 3884. The President signed the bill on May 31, 1870. As enacted, Stewart's original bill became sections 16 through 18 of the Civil Rights Act of 1870:

SEC. 16. *And be it further enacted,* That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void.

SEC. 17. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

SEC. 18. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said Act.

Civil Rights Act of 1870, ch. 114, §§ 16–18, 16 Stat. 140.

In 1866 and 1874, Congress authorized codification of federal statutory law. *See* Act of June 27, 1866, ch. 140, 14 Stat. 74; Act of June 20, 1874, ch. 333, 18 Stat. 113. The codifiers were aware that section 16 of the 1870 Act did not provide aliens with the property rights protection secured by section 1. They, therefore, split section 1 between what is now sections 1981 and 1982 of Title 42. *See* 42 U.S.C. §§ 1981–1982 (1976). The courts have construed section 1982 as prohibiting racial discrimination only. *See, e. g., Arnold v. Tiffany,* 359 F.Supp. 1034, 1035 (C.D.Cal.); *aff'd,* 487 F.2d 216 (9th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974). Section 1981, however, reaches discrimination based upon alienage. *See Graham v. Richardson,* 403 U.S. 365, 377–78, 91 S.Ct. 1848, 1854–55, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish & Game Commission,* 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948).

The Supreme Court has held that section 1981 reaches purely private racial discrimination. *See Runyon v. McCrary,* 427 U.S.

at 168–72, 96 S.Ct. at 2593–95. Hillwood, nonetheless, argues that, with respect to alienage discrimination, section 16 of the 1870 Act reaches only state action. This court, however, rules that the legislative history demonstrates that section 16 applied to purely private alienage discrimination, as well as to that involving state action.

Senator Stewart's comments indicate that he intended the new act to extend the protection of the 1866 Act to aliens. *See* Cong. Globe, 41st Cong., 2d Sess. 3658 (1870). The close parallel between the language of section 16 and that of section 1 supports this conclusion. The codifiers who combined the two sections to form section 1981 obviously felt that Congress had intended no distinction between the scopes of protection provided by the two sections. The structures of the 1866 and 1870 Acts also indicate that section 1981 prohibits private alienage discrimination. Section 1 of the 1866 Act and section 16 of the 1870 Act enumerate the individuals and the rights protected. Section 2 of the 1866 Act and section 17 of the 1870 Act provide criminal penalties for violations of the protected rights if committed "under color of state law." As the Supreme Court stated in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968):

> [I]f § 1 [of the 1866 Act] had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made no sense at all. For that section, which provided fines and prison terms for certain individuals who deprived others of rights "secured or protected" by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed. There would, of course, have been no private violations to exempt if the only "right" granted by § 1 had been a right to be free of discrimination by public officials.

*Id.* at 424–26, 88 S.Ct. at 2195 (footnotes omitted). The Court's analysis of the 1866 Act applies with equal force to the structure of the 1870 Act. *See Guerra v. Manchester Terminal Corp.*, 350 F.Supp. 529, 538 (S.D.Tex.1972), *aff'd in part and rev'd in part*, 498 F.2d 641 (5th Cir. 1974).

Hillwood also argues that Congress enacted section 16 of the 1870 Act pursuant to the fourteenth amendment. It contends that section 16, therefore, could not constitutionally reach private discrimination, because the fourteenth amendment itself applies only to state action. Like the Fifth Circuit, this court "respectfully decline[s] to embrace that *reductio ad absurdum.*" 498 F.2d at 654 n.32. Regardless of which part of the Constitution the 41st Congress actually relied upon, it had the authority to prohibit private discrimination under its plenary power over immigration and naturalization.[2] *See Graham v. Richardson*, 403 U.S. at 377, 91 S.Ct. at 1854; *Takahashi v. Fish & Game Commission*, 334 U.S. at 419, 68 S.Ct. at 1142; *Guerra v. Manchester Terminal Corp.*, 498 F.2d at 654 n.32.

The court, therefore, holds that section 1981 reaches purely private alienage discrimination. Two material factual issues, however, remain unresolved: first, a dispute exists as to whether Hillwood denied membership to Rajpal because of his citizenship; and, second, it is unclear whether the Espinozas had entered into a valid purchase contract at the time that they requested membership. Because of these material factual issues, the court must deny the plaintiffs' motion for partial summary judgment.

### III. HILLWOOD'S MOTION TO DISMISS PLAINTIFFS' FAIR HOUSING CLAIM

The Espinozas and Rajpal claim that Hillwood violated section 3604(a) of the Fair

---

**2.** The Fourth Circuit has reached an analogous conclusion in a recent case. In *Ward v. Connor*, 657 F.2d 45 (4th Cir. 1981), the court held that 42 U.S.C. § 1985(c) reaches private conspiracies to deprive a white man of his right to free exercise of religion. *See id.*, slip op. at 48. It ruled that, despite the role of the thirteenth amendment in the passage of the predecessor to § 1985(c), the section reaches private conspiracies motivated by reasons other than race. *See id.* at 47–48. The court concluded that Congress' power stemmed from its control over interstate travel. *See id.* at 48–49.

Housing Act by refusing to sell residences to them. *See* 42 U.S.C. § 3604(a) (1976). They allege that Hillwood based its refusal solely on their citizenship. The plaintiffs argue that this citizenship policy constitutes discrimination on the basis of national origin. Hillwood has moved under Rule 12(b)(6) to dismiss this Fair Housing claim on two grounds. First, it contends that the 180-day limitation period of section 3612(a) bars the claim. *See id.* § 3612(a). Second, Hillwood argues that discrimination on the basis of citizenship is not a violation of section 3604(a). The court denies the defendants' motion to dismiss the Fair Housing Act portion of the complaint, because relevant factual issues remain unresolved.

### A.  *The Limitation Period Issue*

The Espinozas and Rajpal rely on section 3612(a) as the basis for this court's jurisdiction over their Fair Housing Act claims. *See* Plaintiffs' Complaint ¶ 2. Section 3610 provides an alternative route for bringing such claims into federal court, *see Trafficante v. Metropolitan Life Insurance Co.,* 446 F.2d 1158, 1161 (9th Cir. 1971), *rev'd on other grounds,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), but it is not available in this case. It contains a proviso that blocks access to the federal courts if the aggrieved party has a judicial remedy under a state or local law "substantially equivalent" to the Fair Housing Act. *See* 42 U.S.C. § 3610(d) (1976). Virginia has enacted such a "substantially equivalent" law. *See* Va.Code §§ 36–86 to –96 (1976). As a consequence, section 3610 cannot serve as a jurisdictional basis in this case.

Section 3612(a) provides an aggrieved party with direct access to the federal courts. *See* 42 U.S.C. § 3612(a) (1976). This section, however, requires that any civil action "be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred." *Id.* The section also contains a proviso that authorizes a district court to stay a civil action to allow further conciliation efforts. *See id.* The key issue in determining whether section 3612 bars the plaintiffs'

Fair Housing claims in this case is when does the 180-day period begin to run.

The Espinozas and Rajpal allege that Hillwood has a formal policy of refusing to sell residences to persons who are not United States citizens. The plaintiffs argue that the effect of this policy is to create a continuous denial of their residence applications from the date of first refusal until at least the date of last refusal. Section 3612(a) states that the limitation period runs from the time when the "discriminatory housing practice occurred." *Id.* The question in this case is when does a continuing discriminatory practice "occur" for purposes of the limitation provision. The Fair Housing Act does not define an occurrence. As a consequence of this definitional gap, two divergent views of when a continuing practice occurs have arisen.

### 1.  The *Coles* and *Pennypack* Approaches to Section 3612(a)

The first view to develop was that the initial refusal to sell to a particular party triggers the running of the limitation period for that party. In *Meyers v. Pennypack Woods Home Ownership Association,* 559 F.2d 894 (3d Cir. 1977), a home ownership association first refused to permit the sale of a house to the plaintiff buyer on September 6, 1971. *See id.* at 897. The buyer then attempted to negotiate with the association until December, 1974. *See id.* at 899. He brought a Fair Housing Act suit on January 3, 1975. *See id.* at 897. The Third Circuit held that the limitation period of section 3612 barred the buyer's claim. *See id.* at 899. It reasoned that the 180-day period must run from the date of first refusal in order to avoid circumvention of the limitation:

> If such futile attempts at settlement or negotiation by the alleged injured party were allowed to breathe life into a claim long dead, the 180 day limitation established by Congress would have little significance. Such a tactic, if permitted, would enable a victim of alleged discrimination to circumvent the statute of limitations merely by provoking his adversary into another refusal to sell or rent.

We cannot believe that Congress intended the 180 day limitation of section 3612(a) to operate in such a fashion. *Id.* Thus, the Third Circuit began the running of the limitation period at the time of the first refusal, because it believed that an aggrieved party should not be able to keep a claim alive by the simple device of reapplying for housing. *See also Stingley v. City of Lincoln Park*, 429 F.Supp. 1379, 1390–91 (E.D.Mich.1977).

In *Coles v. Havens Realty Corp.*, 633 F. 2d 384 (4th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981), the Fourth Circuit provided a second view of when the limitation period starts to run. The plaintiffs in that case were three employees of an organization seeking to equalize housing opportunities. *See* 633 F.2d at 385. The employees individually were refused housing by a rental agent on several occasions between March 14, 1978, and July 13, 1978. *See id.* at 386. They brought a class action against the rental agent on January 9, 1979. *See id.* Of the several discriminatory acts, only the final refusal to rent to one of the employees on July 13 occurred within 180 days of the filing of the suit. The Fourth Circuit, however, held that section 3612 did not bar any of the plaintiffs' allegations. *See id.* at 391–92. The court found that the rental agent was engaged in a "continued violation of section 3604." *Id.* at 393. *See also Fair Housing Council of Bergen County, Inc. v. East Bergen County Multiple Listing Service, Inc.*, 422 F.Supp. 1071, 1078 (D.N.J. 1976). It ruled, therefore, that "the violations continued to 'occur' until the last act of July 13, 1978." *Id.*, 633 F.2d at 393. The court adopted this construction to insure the eradication of the discriminatory practice in question. *See id.*

The *Pennypack* and *Coles* decisions present irreconcilable interpretations of the limitation provision of section 3612(a). *Pennypack* supports a strict construction of the limitation clause. The purpose of this approach is to force a party to bring a claim within 180 days of the first discriminatory act against that party. The penalty for failing to do so is forfeiture of all Fair Housing Act remedies against the violator. This policy encourages rapid prosecution or settlement of claims. The *Coles* approach, on the other hand, is an attempt to effectuate the broad remedial goals of Title VIII. *See id.* at 392. It allows an aggrieved party to revive all Fair Housing Act claims against a violator simply by reapplying for housing with the violator.

This court believes that both the *Pennypack* and *Coles* approaches to the Fair Housing limitation period are incorrect. The *Pennypack* interpretation of section 3612(a) is overly strict. Under this construction, many valid Title VIII claims would go unremedied. If the holder of a valid claim fails to file suit within 180 days of the violator's first discriminatory act against him, the holder is barred from suing regardless of how many times the violator later discriminates against him. This interpretation is too narrow, because it permits a violator's policy of discrimination to continue unchecked. It, therefore, does not properly effectuate the broad remedial purposes of Title VIII.

The *Coles* approach is also wrong. It effectively writes the 180-day limitation out of the statute, because it allows an aggrieved party to revive all claims against a violator simply by reapplying for housing. Thus, the *Coles* interpretation is too broad.

This court feels that the proper interpretation of section 3612(a) is to bar all claims not based on discriminatory acts occurring within 180 days of filing suit. This construction is a middle road between *Coles* and *Pennypack*. It would not prevent an aggrieved party from seeking relief simply because he had failed to file suit within 180 days of the violator's first refusal. On the other hand, it would not allow revival of claims based on discriminatory acts occurring outside the 180-day period. *Cf. Player v. State of Alabama Department of Pensions & Security*, 400 F.Supp. 249, 266–67 (M.D.Ala.1975), *aff'd*, 536 F.2d 1385 (5th Cir. 1976) (§ 3612 bars claim unless discriminatory act within 180 days of filing suit). Unfortunately, however, this court is bound

by the Fourth Circuit's opinion in *Coles*. Therefore, it must adopt a construction of section 3612(a) that it feels is not altogether correct.

2. Application of *Coles* to Rajpal

■ The portion of the *Coles* opinion dealing with section 3612(a) applies whenever there is an "allegation of a continuing violation or a pattern of violations." In the present case, Hillwood had a formal policy of denying membership to aliens. Thus, *Coles* provides the controlling authority.

Under the *Coles* approach to section 3612(a), Rajpal may bring claims based on all four of Hillwood's refusals. The last three refusals occurred within 180 days of the filing of this suit. Rajpal's claims based on these acts clearly are not barred. In addition, *Coles* allows him to revive claims based on the first refusal by reapplying for housing within the 180-day period. Because Rajpal did reapply, none of his claims are time-barred under section 3612(a).

3. Application of *Coles* to the Espinozas

■ Hillwood denied the Espinozas' application for housing on April 7, 1980. Rajpal's reapplications with Hillwood do not revive the Espinozas' claim based on the April 7, 1980 refusal. In *Coles*, the Fourth Circuit held that a reapplication by one of the employees of the fair housing organization revived the claims of the other two employees. The employees, however, "were involved in active, consecutive, connected, and continuing attempts to secure or determine compliance." *Coles v. Havens Realty Corp.*, 633 F.2d at 392. This court holds that one complainant's reapplication for housing can revive another's claims only if the two complainants are working together to determine whether a party is violating Title VIII. In the present case, there is no indication that the Espinozas and Rajpal were participating in a common scheme to investigate Hillwood. Rajpal's three reapplications, therefore, cannot revive the Espinozas' Fair Housing Act claims based on the April 7th refusal.

Section 3612(a) does not bar the Espinozas' Fair Housing Act claims only if Hillwood refused membership to them within 180 days of the filing of this suit. The Espinozas allege that they have continued to seek housing from Hillwood through the Human Rights Commission of Fairfax County, Virginia. *See* Plaintiffs' Complaint ¶ 13. Hillwood, however, contends that it has not denied housing to the Espinozas since April 7, 1980. *See* Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss Plaintiffs' Claims Under 42 U.S.C. § 3601 *et seq.*, at 2. Thus, a material factual issue remains as to whether Hillwood committed a discriminatory act against the Espinozas within 180 days of the filing of this suit.

B. *The Issue of Whether the Plaintiffs Have Stated A Cognizable Claim Under Section 3604(a)*

■ The Espinozas and Rajpal contend that Hillwood's refusal to sell housing to them constitutes a violation of section 3604(a). This section makes it unlawful "to refuse to sell or rent . . . a dwelling to any person because of race, color, religion, or national origin." 42 U.S.C. § 3604(a) (1976). The plaintiffs allege that Hillwood's citizenship policy has the purpose or effect of discriminating on the basis of national origin. *See* Plaintiffs' Complaint ¶¶ 29, 33. Hillwood, in turn, denies this allegation.

Hillwood has moved under Rule 12(b)(6) to dismiss the plaintiffs' Fair Housing Act counts for failure to state a claim under section 3604(a). The defendant argues that alienage discrimination is not a *per se* violation of Title VIII, because national origin and alienage are not synonymous terms. Hillwood further contends that it has applied its citizenship policy even-handedly among national-origin groups. It concludes that the court, therefore, ought to dismiss the Fair Housing Act claims.

The court agrees with Hillwood that alienage discrimination is not a *per se* violation of section 3604(a). In *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), an alien brought a Title VII action alleging that a company had refused to hire her because of her "na-

tional origin." *Id.* at 87, 94 S.Ct. at 336. The provision upon which the alien relied, like section 3604(a), prohibits discrimination on the basis of national origin, but not alienage discrimination. *See* 42 U.S.C. § 2000e–2(a)(1) (1976). The Supreme Court ruled that the term "national origin" in Title VII refers to a person's ancestry, and not his citizenship. *See* 414 U.S. at 88, 94 S.Ct. at 336. The Court held, therefore, that alienage discrimination alone does not constitute discrimination on the basis of national origin. *See id.* at 88–91, 94 S.Ct. at 336–338. The *Farah* opinion, of course, does not directly address the Fair Housing Act, but the analogy between the discrimination provisions of Titles VII and VIII is extremely close. This court holds, therefore, that the *Farah* ruling on national origin applies to the Fair Housing Act, as well as to Title VII.

The court finds support for this determination in *Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir.), *cert. denied,* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975). In that case, the plaintiffs brought a Fair Housing Act suit alleging economic discrimination. *See* 509 F.2d at 1111. The Second Circuit reversed a judgment for the plaintiffs on the ground that section 3604 does not forbid economic discrimination. In doing so, the court held that "[a] landlord in the private sector is entitled to choose whom he will accept as tenants as long as he does not discriminate on one of the statutorily condemned bases." *Id.* at 1114. *See also Madison v. Jeffers,* 494 F.2d 114, 117 (4th Cir. 1974).

This court rules on the basis of *Farah* and *Lefrak* that Hillwood's citizenship policy is not a *per se* violation of section 3604(a). Dismissal under Rule 12(b)(6), however, is not proper at this time. The plaintiffs have alleged that the citizenship policy in question had the effect of discriminating on the basis of national origin. In *Farah,* the Supreme Court stated:

> In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination. Certainly Title VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin.

414 U.S. at 92, 94 S.Ct. at 338. Thus, a material factual issue remains in the present case as to whether Hillwood's citizenship policy was a pretext for national-origin discrimination.

## IV. CONCLUSION

For the reasons stated above, the court denies the plaintiffs' motion for partial summary judgment. The plaintiffs have stated a cognizable claim under section 1981. There remain, however, two material factual issues, which the parties ought to resolve at trial. First, a dispute exists as to whether Hillwood denied membership to Rajpal because of his citizenship. Second, the parties disagree on the question of whether the Espinozas had entered into a valid purchase contract at the time that they requested membership.

The court also denies the defendants' motion to dismiss the Fair Housing Act portion of the complaint. Section 3612(a) does not bar any of Rajpal's claims. In addition, the court cannot dismiss the Espinozas' Title VIII claims as time-barred, because it is unclear whether Hillwood refused membership to them within 180 days of the filing of this suit. Finally, the court rules that the plaintiffs have stated a cognizable claim under section 3604(a). The terms "national origin" and "alienage," however, are not synonymous. Thus, the plaintiffs must demonstrate that Hillwood's citizenship policy had the effect of discriminating on the basis of ancestry.

Let the Clerk mail a copy of this Memorandum Opinion to counsel of record for the parties.