MEMORANDUM DECISION
 

 JAMESON, District Judge.
 

 In these consolidated actions
 
 [1]
 
 the plaintiffs challenge Public Land Order No. 5952 issued by the Secretary of the Interior on June 1, 1981, purporting to withdraw from disposition under “all laws pertaining to mineral leasing...” the Bob Marshall,
 
 *979
 
 Scapegoat and Great Bear Wilderness Areas. The Secretary’s action was taken pursuant to a resolution adopted by the House Committee on Interior and Insular Affairs, acting under the authority of section 204(e) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701
 
 et seq.
 
 (FLPMA), finding that an emergency situation existed in these wilderness areas and directing the Secretary to withdraw the areas from the operation of mineral leasing laws until January 1,1984. Specifically the plaintiffs seek a judgment declaring that (1) section 204(e) is unconstitutional in that it violates either the separation of powers doctrine or the bicameralism principle and presentment clause; and (2) the directive of the House Committee is invalid because it (a) is an unlawful usurpation of the discretionary authority delegated to the Secretary by section 204(e); (b) impermissibly conflicts with section 4(d)(3) of the Wilderness Act; (c) deprives lease applicants of due process; and (d) is arbitrary, capricious, and an abuse of discretion.
 

 On June 15, 1981, plaintiff Pacific Legal Foundation and defendant James G. Watt as Secretary of the Interior, stipulated that it was “in the highest national interest to resolve the legal issue ... as soon as possible,” and “that there are no genuine issues of material fact in dispute and that the pivotal issues are issues of law subject to resolution on summary judgment .... ” Pursuant to a request in the stipulation, the court invited both Houses of Congress to participate in the proceedings as
 
 amici curiae.
 

 On August 17,1981, an order was entered granting the motions of The Bob Marshall Alliance, The Wilderness Society, and The Sierra Club to intervene as defendants. Pursuant to stipulation of counsel for all parties, it was ordered that all legal and factual issues relating to the allegations that the action of the House Committee was arbitrary and capricious will be held in abeyance pending resolution of the other constitutional, statutory authority, and statutory interpretation issues raised by plaintiffs. The parties agreed upon a briefing schedule.
 

 Motions for summary judgment were filed by the plaintiffs and a cross-motion by the intervening defendants The Bob Marshall Alliance and The Wilderness Society. The federal defendants filed a cross-motion to dismiss and/or for summary judgment. Extensive briefs were filed by all of the. parties; and memoranda as
 
 amici curiae
 
 were filed by the United States Senate, the Honorable Max Baucus, United States Senator, and the Honorable Morris K. Udall, Chairman, and the Honorable Manuel Lujan, Jr. Ranking Republican Member, on behalf of the Committee on Interior and Insular Affairs, United States House of Representatives. Oral argument was presented on December 1, 1981.
 

 I.
 
 Background
 

 A.
 
 Wilderness Act of 1964
 

 The Bob Marshall, Great Bear and Scapegoat Wilderness Areas are all part of the National Wilderness Preservation System created by the National Wilderness Act of 1964. 16 U.S.C. § 1131
 
 et seq.
 
 (1976). The Wilderness Act provided,
 
 inter alia,
 
 that mineral exploration and leasing activities in the designated wilderness areas Would be permitted to continue until midnight December 31, 1983, after which all exploration and new leasing would cease. Section 4(d)(3), 16 U.S.C. § 1133(d)(3) (1976).
 

 Between 1970 and June 6, 1981, over 340 noncompetitive oil and gas lease applications in these areas were filed with the Bureau of Land Management.
 
 [2]
 
 No leases have been issued for any of the applications. On May 21,1981, notice was published in the Federal Register that the Forest Service — Northern Region was beginning to prepare the Environmental Impact Statement (EIS) on which it would base its rec
 
 *980
 
 ommendation to the Secretary of the Interi- or on pending noncompetitive oil and gas leases, including those in these areas. 46 Fed.Reg. 27735 (May 21, 1981).
 
 [3]
 

 B.
 
 Federal Land Policy and Management Act of 1976
 

 The FLPMA was enacted in 1976 to guide the. Secretary of the Interior in administering the public lands more effectively. 43 U.S.C. §§ 1701-1782 (1976). Section 204(e)
 
 [4]
 
 provides in part that if either the Committee on Interior and Insular Affairs of the House of Representatives or the Committee on Energy and Natural Resources of the Senate
 
 [5]
 
 notifies the Secretary of the Interior that an emergency situation exists, the Secretary shall immediately make a withdrawal of the affected lands.
 

 C.
 
 Resolution Adopted by House Committee
 

 On May 21, 1981, the House Committee on Interior and Insular Affairs, following a hearing,
 
 [6]
 
 adopted, by a vote of 23 to 18, a resolution finding that an “emergency” situation existed in the Bob Marshall, Scapegoat and Great Bear Wilderness Areas and that “extraordinary measures” must be taken “to preserve values that otherwise would be lost.” The resolution authorized and directed the Committee chairman to direct the Secretary to withdraw immediately these lands until January 1, 1984 “from all forms of disposition under all laws pertaining to mineral leasing and all amendments thereto, subject to valid existing rights.”
 

 The Committee chairman, Representative Udall, by letter dated May 21, 1981, sent a copy of the resolution to Secretary Watt. His letter concluded:
 

 As required by the Act, you are to make this withdrawal immediately and you are to file notice of such emergency withdrawal with this Committee and its Senate counterpart. Additionally, you are required to furnish said Committees the information specified in section 204(c)(2) within three months.
 
 [7]
 

 On June 1, 1981, the Secretary issued Public Land Order No. 5952, withdrawing “approximately 1.5 million acres of National forest lands in the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas from mineral leasing in response to an emergency withdrawal resolution adopted by the House Interior and Insular Affairs Committee on May 21, 1981.”
 

 On June 1, 1981, the Secretary sent Representative Udall and the chairman of the Senate Committee a copy of Public Land Order No. 5952. In the letter of transmittal to Representative Udall, the Secretary
 
 *981
 
 questioned (1) the validity of the basis “for declaring an emergency to exist”; (2) the “constitutionality of the action” he had been “directed ... to take”;
 
 [8]
 
 and (3) the statutory authority to withdraw the lands. Nevertheless, “in the interest of maintaining harmony between Congress and the Executive”, he issued the order “in keeping with the directive of the House Interior and Insular Affairs Committee.”
 

 II.
 
 Contentions of Parties
 

 The diverse contentions set forth in the briefs of the parties and
 
 amici curiae
 
 may be summarized as follows:
 

 The
 
 plaintiffs
 
 contend that (1) section 204(e) is unconstitutional because its application through unilateral action by the House Committee (a) violates the separation of powers doctrine, (b) delegates executive power to the committee, (c) violates the requirement of bicameralism, (d) deprives the President of his veto power, and (e) deprives plaintiffs of due process; (2) the Committee exceeded its statutory authority under section 204(e) by withdrawing the areas when there was no emergency situation; and (3) the emergency withdrawal power under section 204(e) cannot be used to frustrate section 4(d)(3) of the Wilderness Act.
 
 [9]
 

 The
 
 federal defendants
 
 contend that (1) the plaintiffs lack standing to maintain the actions because (a) they have not demonstrated actual or threatened injury for purposes of Article III of the Constitution, and (b) the prudential requirements of standing have not been satisfied; (2) plaintiffs have not been deprived of due process; but (3) if plaintiffs have standing to sue, the Committee had no statutory authority to direct the Secretary to withdraw the wilderness areas and the Secretary had no authority to withdraw the lands; and (4) that portion of section 204(e) which authorized the House Committee’s emergency withdrawal resolution is unconstitutional for essentially the same reasons urged by the plaintiffs.
 

 The
 
 intervening defendants
 
 The Bob Marshall Alliance and the Wilderness Society contend that the plaintiffs lack standing for the reasons asserted by the federal defendants and in addition Pacific Legal Foundation lacks standing because none of its members are directly affected by the Government action. All of the
 
 intervening defendants
 
 contend that (1) the constitutionality of the withdrawal order need not be reached because the applications for leases will be denied in any event; (2) under Article IV of the Constitution Congress holds the public lands as properties; (3) Public Land Order No. 5952 is a nondiscretionary act which is not re viewable; and (4) section 204(e) is a valid delegation of congressional authority, and (5) does not violate any constitutional doctrines.
 

 The
 
 amicus curiae
 
 brief filed on behalf of the
 
 House Committee
 
 contends that (1) plaintiffs lack standing; (2) there is no case or controversy between the executive and legislature; (3) the Secretary has statutory authority under section 204(e) to make the withdrawal; and (4) section 204(e) does not violate any constitutional provision.
 

 The
 
 Senate’s amicus curiae
 
 brief contends that (1) section 204(e) evolved from a tradition of withdrawals in aid of the legislative process of “report and wait” agreements; (2) the administrative process must be completed before plaintiffs can seek judicial review; (3) section 204(e) is constitutional, and (4) is a restrained exercise of Congress’ authority under the Territory and Property clause.
 

 The
 
 amicus brief
 
 filed by
 
 Senator Baucus
 
 contends that (1) plaintiffs must show the unconstitutionality of § 204(e) beyond a reasonable doubt; (2) section 204(e) is a
 
 *982
 
 legitimate means of exercising congressional power, (3) is a justifiable means for exercising Congress’ power over the public lands and its power to investigate, and (4) does not violate the principles of separation of powers, bicameralism or presentment; and (5) plaintiffs have not been denied due process since no rights had accrued upon mere applications for leases.
 

 III.
 
 Recent Developments
 

 Significant developments subsequent to the filing of the briefs, but discussed in oral argument, include the following:
 

 (1) On September 10, 1981, Secretary Watt filed with the House Committee on Interior and Insular Affairs and the Senate Committee on Energy and Natural Resources the report required by section 204(e) and (c)(2) of the FLPMA and the May 21 resolution of the House Committee. This report was considered by the House Subcommittee on Public Lands and National Parks at a meeting on November 20, 1981.
 

 (2) On October 26, 1981, Senator Baucus introduced S. 1774 to amend section 4(d)(3) of the Wilderness Act (which as noted
 
 supra,
 
 n. 5, provides that wilderness areas are subject to the provisions of mining and mineral leasing laws until midnight December 31, 1983), by adding a new subparagraph:
 

 . . . effective May 21, 1981, the Bob Marshall, Scapegoat, and Great Bear Wilderness areas in Montana are withdrawn from all forms of appropriation under the mining laws and from disposition under all forms of appropriation under the mining laws and from disposition under all laws pertaining to mineral leasing and all amendments thereto.
 

 (3) On November 19, 1981, Secretary Watt addressed letters to the chairmen of the Senate Committee on Energy and Natural Resources and the House Committee on Interior and Insular Affairs regarding changes he had that day approved “which affect the procedures for handling oil and gas lease applications on lands within the nation’s 158 Congressionally-designated wilderness areas.” Since the policy changes approved by the Secretary have a significant bearing on the resolution of this controversy, the Secretary’s letter is quoted in a footnote.
 
 [10]
 

 
 *983
 
 (4) On November 20, 1981, the House Committee on Interior and Insular Affairs by a vote of 40 to 1 adopted a resolution with respect to mineral leases in wilderness areas. After noting the letter from Secretary Watt setting forth changes in departmental policies, which were commended, but expressing the continued concern of the Committee with regard to mineral leasing in wilderness areas, the Resolution concludes:
 

 NOW, THEREFORE, BE IT RESOLVED that without waiving its rights under section 204 of the Federal Land Policy and Management Act of 1976 the Committee on Interior and Insular Affairs calls upon the President and the Secretaries of the Interior and Agriculture to refrain from issuing mineral leases under the mineral leasing laws of the United States in congressionally designated wilderness areas until June 1,1982, to provide the Committee opportunity to study and evaluate the full implication of the recent changes in policy affecting mineral leasing in wilderness areas and to consider any legislation which may be appropriate.
 

 IV.
 
 Procedural Questions
 

 A.
 
 Jurisdiction
 

 Plaintiffs have properly invoked jurisdiction under 28 U.S.C. § 1331 (1976) (“federal question”) and 5 U.S.C. §§ 701-706 (1976) (“The Administrative Procedure Act”). 28 U.S.C. § 2201 (1976) (“The Declaratory Judgment Act”) provides a remedy, not a grant of jurisdiction.
 
 [11]
 

 B.
 
 Justiciability
 

 1.
 
 Standing
 

 Plaintiffs may not invoke the jurisdiction of a federal court unless they show the existence of an actual “case or controversy”. Article III, Section 2, United States Constitution. This requirement is satisfied when a party demonstrates “injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury.. .. ”
 
 Duke Power Co. v. Carolina Environmental Study Group, Inc.,
 
 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978);
 
 Chadha v. Immigration and Naturalization Service,
 
 634 F.2d 408, 415 (9 Cir. 1980),
 
 cert. granted,
 
 - U.S. -, 102 S.Ct. 87, 70 L.Ed.2d 80 (1981). The Supreme Court has also stated that “parties with sufficient concrete interests at stake have been held to have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights.”
 
 Buckley v. Valeo,
 
 424 U.S. 1, 12 n. 10, 96 S.Ct. 612, 631 n. 10, 46 L.Ed.2d 659 (1976) (per curiam). The “case or controversy” requirement is also satisfied if a plaintiff has “ ‘alleged such a personal stake in the outcome of the controversy’ to warrant
 
 his
 
 invocation of federal-court jurisdiction and to justify exercise of the court’s remedial powers on his behalf.”
 
 Warth v. Seldin,
 
 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original).
 
 [12]
 
 Defendants and
 
 amici
 
 argue that plaintiffs lack
 
 *984
 
 standing because (1) they cannot demonstrate actual or imminent concrete injury to themselves or the individuals they represent; and (2) they are asserting a nonjusticiable generalized grievance.
 

 a.
 
 Injury to Individuals
 

 Eight members of the Mountain States Legal Foundation (MSLF) and the six individual plaintiffs who are also “supporters” of The Pacific Legal Foundation (PLF) hold noncompetitive lease applications to lands within the three wilderness areas. Plaintiffs allege that these individuals were injured by Public Land Order No. 5952 because it (1) deprived them of their due process right of notice and opportunity to be heard with regard to the order, (2) deprived them of their due process right to have their applications processed and decided upon by the Secretary of the Interior, and (3) diminished the market value of their lease applications. Nothing in thé FLPMA establishes a right to notice and an opportunity to comment before section 204(e) is invoked to require a withdrawal. See 43 U.S.C. § 1714(h) (1976). Plaintiffs’ claim to this right is therefore rejected. Case law does establish, however, the right to have a lease application properly processed by the appropriate agency. Injury to that right would establish standing for the aggrieved individual.
 

 A person has been “adversely affected or aggrieved by agency action within the meaning of a relevant statute”, 5 U.S.C. § 702 (1976), when (1) he has been “injured in fact”, and (2) his interests are within the “zone of interests” which is protected or regulated by the relevant statute. See
 
 United States v. SCRAP,
 
 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973);
 
 Sierra Club v. Morton,
 
 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). Plaintiffs’ claim of injury is based on the fact that the Bureau of Land Management (BLM) has notified lease applicants that, as a result of Public Land Order No. 5952, the land within the wilderness areas has been “suspended”.
 
 [13]
 

 Both the “injury in fact” and “zone of interests” questions depend upon what rights are conferred on noncompetitive lease applicants.
 
 [14]
 
 Plaintiffs agree that
 
 *985
 
 noncompetitive leases do not vest in the applicants “any right to leases, or generate any legal interest similar to a property right. . . . ”
 
 Burglin
 
 v. Morton, 527 F.2d 486, 488 n. 2 (9 Cir. 1976),
 
 cert. denied,
 
 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976). As stated in
 
 Arnold v. Morton,
 
 529 F.2d 1101, 1106 (9 Cir. 1976), however, “A mere application for a lease vests no rights in the applicant, (citation omitted),
 
 except the right to have the application fairly considered under applicable statutory criteria.”
 
 (Emphasis added.) In another case involving noncompetitive leases, the court said:
 

 Of course an applicant for a lease under the Mineral Leasing Act is entitled to certain legal protections. He has a legal right that the cognizant officials may not disregard his application on a basis other than that permitted by law. The same may be said of any one desiring to contract with the United States — he has no right to a contract, but he has a right to an equal opportunity to contract that is not negatived by resort to illegal procedures or standards. (Footnote omitted).
 

 Schraier v. Hickel,
 
 419 F.2d 663, 667 (D.C. Cir.1969).
 

 Although the issue of standing was not specifically addressed in either
 
 Arnold
 
 or
 
 Schraier,
 
 the fact that both courts reached the merits indicates that standing was recognized. Moreover, it seems evident that if a lease applicant has a right to have his application properly considered, he also has the standing to defend that right against unlawful interference.
 

 The standing of an applicant to challenge unlawful impediments to the consideration of his application was specifically discussed in
 
 Krueger v. Morton,
 
 539 F.2d 235 (D.C. Cir.1976). In
 
 Krueger,
 
 the plaintiff had filed an application for a coal prospecting permit with the BLM, pursuant to section 2(b) of the Mineral Leasing Act. 30 U.S.C. § 201(b) (1970).
 
 [15]
 
 When the Secretary issued an order rejecting all pending applications, the plaintiff filed suit. Citing
 
 Duesing v. Udall,
 
 350 F.2d 748 (D.C.Cir.1965),
 
 cert. denied,
 
 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966), for the proposition that the filing of an application does not give any right to a lease or generate a legal interest which reduces or restricts the discretion vested in the Secretary, the Secretary argued “that the appellant has not alleged specific injury in fact, nor has he demonstrated that possible injury was arguably within any protected zone of interest . . . . ”
 
 Id.
 
 at 238. The court did not agree:
 

 Appellee [the United States] has confused lack of an established property interest with lack of standing to question allegedly unjustifiable obstacles to the perfection of such an interest. It is true that
 
 *986
 
 the applicant acquired no vested interest by the mere filing of his application. But he did have the right to avail himself of the application route in an effort to perfect an interest to the extent that this was not precluded by law or by some valid exercise of the agency’s discretion. Were it otherwise an applicant could be unlawfully deprived of the right to pursue his application to the point of consummated interest without means for effective complaint. (Footnote omitted).
 

 As in
 
 Krueger,
 
 the “suspension” of the lease applications in this case is an injury in fact and the right to have the applications properly considered by the Secretary is within the zone of interests protected by the Mineral Leasing Act of 1920, 30 U.S.C. § 226 (1976), and the Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a (1976).
 
 [16]
 

 With regard to the second standing requirement of
 
 Duke Power Co., supra,
 
 the relief requested will redress the claimed injury. Defendants The Bob Marshall Alliance and The Wilderness Society mischaracterize the relief sought. Plaintiffs do not claim a right to, entitlement to, or property interest in the leases. They cannot and do not seek a judgment which would require leases to be issued to them. They seek only what they are entitled to and what the courts are obligated to protect: their right to have their applications “fairly considered under the applicable statutory criteria,”
 
 Arnold,
 
 529 F.2d at 1109, without being “negatived by resort to illegal procedures or standards.”
 
 Schraier,
 
 419 F.2d at 667. I therefore conclude that the individual lease applicants have standing to bring this action.
 
 [17]
 

 b.
 
 Prudential Considerations
 

 Defendants also argue that plaintiffs’ asserted harm is a “generalized grievance” shared in substantially equal measure by all or a large class of citizens, and that, therefore, the prudential requirements of standing have not been satisfied.
 
 Warth v. Seldin,
 
 422 U.S. at 499, 95 S.Ct. at 2205;
 
 Duke Power Co.,
 
 438 U.S. at 80, 98 S.Ct. at 2634;
 
 Schlesinger v. Reservists Committee to Stop the
 
 War, 418 U.S. 208, 220, 94 S.Ct. 2925, 2931, 41 L.Ed.2d 706 (1974);
 
 Sierra Club v. Morton,
 
 405 U.S. at 735, 92 S.Ct. at 1366;
 
 Western Mining Council v. Watt,
 
 643 F.2d 618, 623 (9 Cir. 1981),
 
 petition for cert. denied
 
 - U.S. -, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). Plaintiffs’ injury, however, bears little resemblance to the generalized injuries alleged in those cases.
 

 Plaintiffs have been injured by the operation of the statute they challenge and have the motive required for a sharp presentation of the issues. Their claim “is not a generalized grievance. Instead ... it focuses on a particular [statute] and is not dependent on speculation about the possible actions of third parties not before the court.”
 
 Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,
 
 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Their claim is specific and concrete and their injury presents the necessary “actionable causal relationship.”
 
 Id.; Warth v. Seldin,
 
 422 U.S. at 507, 95 S.Ct. at 2209.
 

 
 *987
 
 The fact that other lease applicants were affected by Public Land Order No. 5952 does not detract from the fact that plaintiffs present “a specific instance of injury flowing directly from the statute’s operation.”
 
 Chadha,
 
 634 F.2d at 418. Prudential requirements are satisfied.
 

 c.
 
 Standing of Organizations
 

 An organization has standing to represent its injured members,
 
 Sierra Club v. Morton,
 
 405 U.S. at 739, 92 S.Ct. at 1368, even in the absence of injury to itself.
 
 Warth
 
 v.
 
 Seldin,
 
 422 U.S. at 511, 95 S.Ct. at 2211. MSLF has standing to represent its eight members who hold lease applications in the wilderness areas.
 
 [18]
 

 PLF contends that it has (1) standing to sue on behalf of its “supporters” and (2) organizational standing on the basis of its own institutional injuries.
 

 PLF cites two cases in support of its first contention, both of which are distinguishable. In
 
 Hunt v. Washington State Apple Advertising Commission,
 
 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court held that a non-membership organization, the Washington Apple Advertising Commission, had standing to represent Washington apple growers in an interstate commerce action against North Carolina. The Court’s decision extending standing to an organization that did not have members in the traditional trade association sense was based on factors not here present. First, the Commission, for all practical purposes, performed the functions of a traditional trade association, thus “serving a specialized segment of the State’s economic community which is the primary beneficiary of its activities, including prosecution of this kind of litigation.”
 
 Id.
 
 at 344, 97 S.Ct. at 2442. Second, the supporters of the Commission possessed all of the indicia of membership in an organization. They alone elected, served on, and financed the Commission.
 
 Id.
 
 Third, the Court found that the Commission, which was financed through annual assessments on the apple industry, might itself be adversely affected by the outcome of the litigation.
 
 Id.
 
 at 345, 97 S.Ct. at 2442. These factors are not present in the PLF.
 

 Contrary to PLF’s contentions,
 
 Legal Aid Society of Alameda County v. Brennan,
 
 608 F.2d 1319 (9 Cir. 1979),
 
 cert. denied,
 
 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980), did not hold that the Legal Aid Society of Alameda County had organizational standing in representing several black residents of the county. The organization’s standing was not challenged separately,
 
 id.,
 
 at 1332 n. 24, and the court’s analysis of standing concerned only injury to the individual plaintiffs.
 
 Id.
 
 at 1333-1336.
 

 Citing
 
 Coles v. Havens Realty Corp.,
 
 633 F.2d 384 (4 Cir. 1980), PLF claims to have organizational standing independent of its supporters. This case is likewise distinguishable. The corporate plaintiff in
 
 Coles,
 
 Housing Opportunities Made Equal (HOME), was a Virginia nonprofit corporation “created for the purpose of eliminating unlawful, discriminatory housing practices, thereby seeking to make equal opportunity in housing a reality in the Richmond Metropolitan Area.”
 
 Id.
 
 at 385. Its investigative, counseling and legal referral activities were specifically related to that purpose.
 
 Id.
 
 The court found that HOME’S activities' and injuries resembled those of the nonprofit developer in
 
 Village of Arlington Heights, supra,
 
 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450.
 
 Id.
 
 at 390-91. Unlike HOME, PLF’s goals are not “functional,
 
 *988
 
 requiring identifiable
 
 actionid.,
 
 at 391, nor do its projects provide “that ‘essential dimension of specificity’ that informs judicial decisionmaking”, as described in
 
 Arlington Heights,
 
 429 U.S. at 263, 97 S.Ct. at 562. PLF’s concerns are more of the general interest found to be insufficient for standing in
 
 Sierra Club v. Morton, supra.
 
 I conclude that PLF itself lacks standing.
 
 [19]
 

 2.
 
 Political Question
 

 The Bob Marshall Alliance and The Wilderness Society argue that this case presents a nonjusticiable political question. Since this case is resolved on statutory grounds, it is not necessary to address this constitutional argument.
 
 [20]
 

 3.
 
 Adverseness
 

 Defendants also argue that the case lacks the necessary adverseness. Neither Secretary Watt’s acquiescence in the Committee’s resolution nor his position on the constitutional issue destroys the adverse nature of this case. The cases cited by defendants and
 
 amici
 
 to support their argument that courts have not allowed third parties to raise separation of powers arguments are distinguishable from the present case, whereas
 
 Chadha
 
 is directly on point.
 

 In
 
 Chadha,
 
 the Immigration and Naturalization Service agreed with the plaintiff that section 244(c)(2) of the Immigration and Nationality Act was unconstitutional. We have a similar situation. As in
 
 Chadha,
 
 plaintiffs assert a concrete controversy, and the court has invited Congress to appear as
 
 amici.
 
 The necessary adverseness is further manifested by the Justice Department’s concerted efforts to defend the Secretary and avoid the constitutional issues on both procedural and statutory grounds.
 

 The Secretary’s acquiescence, especially with his strongly stated reservations, falls well within established political traditions.
 
 [21]
 
 Arguments for the interpretation and constitutionality of § 204(e) have been ably advanced by intervening defendants and
 
 amici.
 
 This court can therefore -reach the merits of the case.
 
 [22]
 

 4.
 
 Ripeness
 

 Finally, the Senate, The Bob Marshall Alliance, and the Wilderness Society argue that plaintiffs have not exhausted their administrative remedies and therefore the case is not ripe for judicial review. Specifically, they argue that the following administrative process remains to be completed: (1) the Forest Service must complete an environmental impact statement (EIS) for these wilderness areas; (2) the Forest Service must decide, subject to review by the Secretary of Agriculture, whether to recom
 
 *989
 
 mend leasing in these areas; (3) if leasing is approved by the Forest Service, the BLM must decide whether to grant the lease applications, which, the Senate notes, could only be done if the Secretary decides to revoke the withdrawal order; (4) if the withdrawal order is revoked and the leases are granted or denied, the applicants or their challengers may take an administrative appeal as of right to the Department of the Interior’s Board of Land Appeals; (5) from there, the decision may be appealed to the Secretary if he so chooses 43 C.F.R. §§ 4.5, 4.410 (1980). Only after the Secretary decides to grant or deny the lease applications, argue defendants and
 
 amici,
 
 is there a final administrative order which this court can properly review. 30 U.S.C. § 226-2 (1976).
 

 It is a general rule of judicial administration that “no one is entitled to judicial relief for a supposed or threatened injury unless the prescribed administrative remedy has been exhausted.”
 
 Myers v. Bethlehem Corp.,
 
 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). Unless exhaustion is statutorily mandated, which it is not in this ease, the exhaustion requirement is not jurisdictional and is a matter within the sound discretion of the court.
 
 United States v. Abilene and Southern By.,
 
 265. U.S. 274, 282, 44 S.Ct. 565, 567, 68 L.Ed. 1016 (1924);
 
 Kale v. United States,
 
 489 F.2d 449, 454 (9 Cir. 1973),
 
 cert. denied,
 
 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220 (1974).
 

 As of June 15, 1981, as a result of the withdrawal order, the preparation of the EIS for the wilderness areas was stopped by order of the Regional Forester-Region I. The Forest Service has stated that it will not consider lease applications in the wilderness areas “until such time, if ever, as the mineral withdrawal is no longer in effect . .. ”. Most important, the Secretary has stated that “all administrative process with regard to the lease applications ended with the issuance ... of Public Land Order No. 5952. ...”
 

 The administrative process which must allegedly be completed has already been terminated by the agencies responsible for its completion.
 
 [23]
 
 There is no reason to believe that absent a compelling court order the present impediments will be removed and the process continued. The basic purpose of the exhaustion doctrine is “to allow an administrative agency to perform functions within its special competence — to make a factual record, to apply its expertise, and to correct its own errors. . . . ”
 
 Parisi v. Davidson,
 
 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972). The agencies themselves say there is nothing left for them to do. Resort to administrative remedies is not required where the process would be futile or serve no purpose.
 
 Pence v. Kleppe,
 
 529 F.2d 135, 143 (9 Cir. 1976). This case is therefore ripe for review.
 

 V.
 
 Statutory Interpretation
 

 It is a fundamental rule of judicial restraint that a court should not “pass on questions of constitutionality . . . unless such adjudication is unavoidable.”
 
 New York City Transit Authority v. Beazer,
 
 440 U.S. 568, 582, 99 S.Ct. 1355,1364, 59 L.Ed.2d 587 (1979), quoting from
 
 Spector Motor Service, Inc. v. McLaughlin,
 
 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). The federal defendants and the Senate offer two different statutory interpretations which would permit this court to resolve the pending motions without passing on the constitutionality of section 204(e).
 

 A.
 
 “Withdrawal” under Mineral Leasing Laws
 

 The Secretary argues that the FLPMA does not authorize withdrawals from disposition under the mineral leasing laws, and therefore, neither the House Committee nor the Secretary had the statutory authority to direct the withdrawal from leasing. Specifically, the Secretary argues that (1) as indicated in the House
 
 *990
 
 Committee report on the FLPMA, H.Rep. No.94-1163, 94th Cong. 2nd Sess. 1 (1976), reprinted in 5 U.S.Code Cong. & Admin. News [U.S.C.C.A.N.] 6175 (1976), the word “withdrawal” was “defined to preserve its traditional meanings”,
 
 id.
 
 at 6179; (2) the traditional meaning of withdrawal, as established in
 
 Udall v. Tallman,
 
 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), does not include withdrawal from disposition under the mineral leasing laws,
 
 id.
 
 at 19, 85 S.Ct. at 802; and (3) the Secretary has consistently construed the term “withdrawal” as used in the FLPMA as not including withdrawal from leasing.
 

 The meaning of “withdrawal”, as used in the FLPMA, must be determined by considering Congress’ previous use of the word, the language of the FLPMA, case law, and relevant agency interpretations. Prior to the passage of the FLPMA, Congress repeatedly and specifically used the term “withdrawal” in other statutes in such a way as to exclude Federal lands from mineral leasing. See,
 
 e.g.,
 
 Wilderness Act of 1964, section 4(d)(3), 16 U.S.C. § 1133(d)(3) (1976);
 
 [24]
 
 Wild and Scenic River Act of 1968, section 9(a)(iii), 16 U.S.C. § 1280(a) (1976).
 
 [25]
 

 The FLPMA itself speaks of “withdrawals” from mineral leasing. In section 204(1), 43 U.S.C. § 1714(1) (1976), Congress associated the term withdrawal with the exclusion of lands from operation of the Mineral Leasing Act:
 

 The Secretary shall . . . review withdrawals .. . which closed the lands to appropriation under the Mining Law of 1872 ... or to leasing under the Mineral Leasing Act of 1920....
 

 The FLPMA also states that “Withdrawals made pursuant to section 1714 [204] of this title may be used in carrying out management decisions ...,” 43 U.S.C. § 1712(e)(3) (1976), which by definition cover “mineral exploration and production.”
 
 [26]
 
 When an emergency withdrawal is made, section 204(e) and section 204(c)(2)(12), 43 U.S.C. § 1714(c)(2)(12) (1976), require the Secretary to furnish the two congressional committees with “a report prepared by a qualified mining engineer . . . which shall include . . . information on .. . mineral leases.... ” Such information would be superfluous if the term withdrawal was not intended to pertain to mineral leasing.
 

 Most significantly, section 204(e) provides that an emergency withdrawal is to be made only when “extraordinary measures must be taken to preserve values that would otherwise be lost. . . . ” Those values are specifically defined as “scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological
 
 *991
 
 values. ...” 43 U.S.C.'§ 1701(a)(8) (1976). Recent wilderness and wildlife legislation,
 
 supra,
 
 clearly indicates that Congress is aware of the effect mineral exploration and production may have on these values. It would be unreasonable to hold that the emergency withdrawal contemplated by section 204(e) was not intended to give the congressional committees and the Secretary the power to preserve these values by withdrawing the land from disposition under the mineral leasing laws.
 

 Udall v. Tallman
 
 does not require a contrary conclusion. At issue in that case was the effect of Executive Order No. 8979 and Public Land Order No. 487 upon the Secretary of the Interior’s authority to issue oil and gas leases. 380 U.S. at 2, 85 S.Ct. at 794. The Public Land Order directed that certain public lands in Alaska be “temporarily withdrawn from settlement, location, sale or entry.....”
 
 [27]
 
 As the Secretary points out, this language is similar to that used in the FLPMA to define withdrawal.
 
 [28]
 
 In
 
 Udall
 
 v.
 
 Tallman,
 
 the Secretary interpreted both orders not to bar oil and gas leases. The Court upheld that interpretation, finding that the Secretary had consistently construed both orders not to bar oil and gas leases, and also that this interpretation had repeatedly been made a matter of public record.
 
 Id.
 
 at 4, 85 S.Ct. at 795. The Court, however, considered only the administrative agency’s construction of two particular orders. The Court did not construe the statute on which the orders were based; nor did it indicate that its interpretation of the word “withdrawal” extended beyond its use in the two orders.
 
 Id.
 

 This conclusion is supported by two subsequent lower court decisions. In
 
 Mecham v. Udall,
 
 369 F.2d 1 (10 Cir. 1966), the court rejected the interpretation now urged by the Secretary, holding that
 
 Udall v. Tallman
 
 demonstrates that an Executive Order could validly withdraw lands from mineral leasing.
 
 Id.
 
 at 3.
 
 Mountain States Legal Foundation v. Andrus,
 
 499 F.Supp. 383 (D.Wyo.1980), specifically considered the FLPMA definition of withdrawal. The court held that the “plain meaning of Congress’ definition of ‘withdrawal’ ” was to “effectively remove large areas of federal land from oil and gas leasing ... in order to maintain other public values in the area, namely those of wilderness preservation.”
 
 Id.
 
 at 391. Significantly, the Secretary did not appeal that decision.
 

 Finally, it should be noted that unlike the
 
 Udall v. Tallman
 
 interpretation of two specific orders, there is no consistent interpretation of the word “withdrawal”, as generally used, as excluding withdrawal from disposition under the mineral leasing laws. As noted in
 
 Udall v. Tallman,
 
 380 U.S. at 20 n. 15, 85 S.Ct. at 803 n. 15, between 1940 and 1952, at least 173 Executive and Public Land Orders expressly barred mineral leasing. Between 1936 and 1954, at least 146 orders expressly permitted mineral leasing.
 
 Id.
 

 Subsequent to Public Land Order 487
 
 (Udall v. Tallman, supra),
 
 the Secretary issued orders withdrawing portions of the land covered by it “from all forms of appropriation under the public land laws, including the mining laws, and the mineral leasing laws. . . . ” Public Land Order No. 751, 16 Fed.Reg. 9044 (Aug. 29, 1951) and Public Land Order No. 778, 17 Fed.Reg. 159 (Dec. 29, 1951).
 

 In conclusion, the relevant sources indicate that there is no traditional definition of “withdrawal” which would prevent the
 
 *992
 
 committees or the Secretary from withholding disposition of these lands from mineral leasing. The Secretary’s statutory interpretation is therefore rejected.
 
 [29]
 

 B.
 
 Secretary’s Power to Revoke Order
 

 As discussed above, pursuant to the directive from the House Committee, the Secretary withdrew the three wilderness areas from all mineral leasing until January 1, 1984 — the date when all exploration and new leasing would cease under the Wilderness Act of 1964. The Senate, now supported in large part by the House Committee, Senator Baucus, and the PLF, interprets section 204(e) to permit the Secretary to “revoke the withdrawal order after a reasonable time.”
 
 [30]
 
 Since the interpretation of section 204(e) and effect of the Committee’s resolution are crucial in determining whether it is necessary to reach the constitutional issue, it seems advisable to set out in some detail the contentions of the Senate and the position of the other parties.
 

 The Senate’s interpretation of section 204(e) is summarized by the following excerpts from its memoranda:
 

 During the administrative process [which should continue despite the Committee resolution], plaintiffs may receive the leases they seek without a constitutional challenge; the agency may construe the June withdrawal order as not a bar to leasing, or may revoke that withdrawal order. Alternatively, plaintiffs may be denied the leases they seek . . . through an administrative decision on policy grounds....
 

 [I]f the case is stayed or dismissed there is every reason for the Forest Service to go forward with the administrative process and resolve plaintiff’s applications .... [T]he Secretary of the Interior has power to decide whether to accept [The Forest Service’s] recommendation and to revoke such a withdrawal order after a reasonable time. The House Committee action did not purport to bar preparation of an environmental statement; it merely required the Secretary of the Interior to submit a report and to issue a temporary withdrawal order.
 

 [I]f [the Bureau of Land Management] decides to lease, it could do so notwithstanding the withdrawal order. . . .
 

 [I]f the Forest Service and Bureau of Land Management approve leasing in the Bob Marshall Wilderness area, they can recommend to the Secretary of the Interior that he consider revoking the withdrawal order.... [T]he basis for believing that power to be available should be noted.
 

 Traditionally, prior to FLPMA, the Secretary of the Interior could revoke temporary withdrawals in aid of legislation under either of the two bases on which they were made, the Pickett Act or
 
 *993
 
 implied executive authority. Only withdrawals by a specific Act of Congress could not be revoked.
 

 FLPMA continued that traditional law Under section 204(a) of FLPMA, 43 U.S.C. § 1714(a) (1976), “[o]n or after the effective date of this Act the Secretary is authorized to make, modify, extend, or
 
 revoke
 
 withdrawals but only in accordance with the provisions and limitations of this section.” (Emphasis supplied). The explicit “limitations of this section,” apart from any implicit in section 204(e) itself, are stated in section 204(j), 43 U.S.C. § 1714(j) (1976): “[t]he Secretary shall not make, modify, or revoke any withdrawal created by Act of Congress,” or revoke national monument or wildlife refuge withdrawals. The kind of withdrawal intended by 204(j)’s phrase, “created by Act of Congress,” to be irrevocable is a permanent withdrawal by specific statute, such as a statute creating a particular national park. A section 204(e) temporary withdrawal created by administrative order pursuant to a committee resolution is not created in section 204(j)’s sense by an “Act of Congress.”
 

 There is merit in the Senate’s analysis of the meaning and effect of section 204(e). Although this section does authorize the Committee to make a finding that an emergency situation exists, nothing in the statute authorizes the Committee to set the duration of a withdrawal.
 
 [31]
 
 In fact, as noted above, both the language of the FLPMA and previous revocations of withdrawals by the Secretary indicate that he alone has the authority to set the terms and duration of a withdrawal. His discretion in that regard is to be exercised pursuant to the goals and procedural requirements of the FLPMA, and, as with any other discretionary act, is subject to judicial review. This interpretation is supported by the manner in which the House Committee has previously exercised its authority under section 204(e).
 

 When an Alaska lands bill failed in the Senate during the final hours of the 1978 Congressional session, the Department of the Interior prepared and released a supplement to the 1974 environmental impact statement which discussed alternative administrative actions to preserve the status quo until the next congressional session.
 
 State of Alaska v. Carter,
 
 462 F.Supp. 1155, 1157 (D.Alaska, 1978). The State of Alaska filed suit challenging the legality of the various administrative actions involved and later filed land selections on several million acres of the land discussed in the EIS.
 
 Id.
 
 On November 15, 1978, the Committee through Chairman Udall, sent a letter to the Secretary of the Interior which “urge[d]” the Secretary to immediately exercise his authority under section 204(e), “to assure that these significant values are saved.”
 
 Id.
 
 at 1158 n. 5.
 
 [32]
 
 The Secretary followed the Committee’s request and withdrew the land the next day.
 

 Section 204(e) was invoked again six months later when the Committee decided
 
 *994
 
 that exploratory drilling for uranium on public lands in the Casitas Reservoir Watershed would endanger the water supply of the cities of Ojai and Ventura, California.
 
 [33]
 
 On May 4, 1979, Chairman Udall sent a letter to the Secretary of the Interior which stated in part: “The Committee requests that you take appropriate action for the withdrawal of these lands at the earliest possible date.” Again the Secretary followed the Committee’s request and withdrew the land.
 

 Significantly, in neither of these situations did the Committee attempt to direct the Secretary as to the duration of the requested withdrawal. Instead, the Secretary exercised his authority under section 204(e) to set the scope and duration of the withdrawals.
 
 [34]
 

 The language “urge” and “request” indicates that the Committee itself initially interpreted section 204(e) to grant it only the limited authority presently described in the Senate’s memoranda. Had the Committee believed it had the authority to dictate the scope and duration of a withdrawal, it seems likely that it would have exercised that power in the watershed case, where public health and safety were threatened.
 

 The Secretary argues that it would not “appear reasonable,” assuming the constitutionality of section 204(e), to deny the Committee’s power to determine both the necessity and duration of the withdrawal. The Committee’s authority to require a temporary withdrawal, however, empowers it to maintain the status quo until both congressional committees receive reports from the Secretary.
 
 [35]
 
 Either committee may then seek appropriate legislation. This interpretation of section 204(e) does not render it superfluous, but instead gives the committees authority which is reasonably “in aid of legislation.”
 

 In summary, although nothing in section 204(e) gives the Secretary the express authority to revoke a committee initiated emergency withdrawal, both the language and history of the FLPMA imply this authority. There is no language which expressly or impliedly grants the committees the power to enforce a withdrawal for a specific duration. I therefore conclude that the Secretary has the power under section 204(e) to revoke, after a reasonable time, an emergency withdrawal initiated by either congressional committee.
 
 [36]
 

 C.
 
 Effect of Recent Developments
 

 As set forth above, recent developments include the following: (1) Secretary Watt has submitted to the House and Senate
 
 *995
 
 committees the report required by section 204(e); (2) Senator Baucus has introduced a bill withdrawing the three wilderness areas from all mineral leasing, effective May 21, 1981; (3) Secretary Watt has sent letters to the chairmen of the House and Senate committees setting forth procedures for handling oil and gas leases on lands within all wilderness areas; and (4) the House Committee has adopted a resolution calling upon the President and Secretaries of Interior and Agriculture to refrain from issuing mineral leases within eongressionally designated wilderness areas until June 1, 1982 to permit the committees “to study and evaluate the full implication of the recent changes in policy” and consider appropriate legislation.
 

 The Senate, The Bob Marshall Alliance and The Wilderness Society suggest that these developments manifest an ongoing political process whereby the legislative and executive branches are capable of pragmatically resolving their difficulties without the necessity of court intrusion. In oral argument the Senate took the position that the second resolution adopted by the House Committee on November 20 “would cover all wilderness areas . . . including the Bob Marshall” and “offers an opportunity to see if the case can be resolved in a nonconstitutional way.” Counsel suggested that the court might “encourage that kind of resolution [by a] stay [of] proceedings. . . . ”
 

 Counsel for the House Committee was “not sure” that the resolution of November 20 superseded the May 21 resolution, but stated that “It certainly addresses the same subject matter. I think the Committee assumed it was dealing comprehensively with the problem in all the wilderness areas. That was the context in which the issue arose.” Counsel also called attention to a statement of Congressman Cheney at the November 20 meeting of the Committee: “I have had discussions with the Secretary of the Interior, who is the individual who has the authority to lease, and he has assured me he will have no problems at all complying with the June 1, 1982 request of the Committee.”
 

 Counsel for the federal defendants argued that the recent actions have no effect on the constitutional issues but suggested that if the House Committee had passed a resolution revoking its previous resolution the case might well be different. Counsel recognized that if the House Committee on May 21 had passed a resolution similar to the resolution passed on November 20, there would be no constitutional problem, but contends that the May 21 resolution is still in effect, and “so long as the May 21 resolution is in effect, the unconstitutional actions persist.” This problem could, of course, be resolved by a resolution of the House Committee clarifying its November 20 resolution to provide expressly that it was applicable to the three wilderness areas in question, thus superseding the May 21 resolution.
 

 Action on the Baucus bill, introduced on October 21, 1981, after receipt of the Secretary’s report, would resolve most of the issues raised in this case. All parties agree that Congress may withdraw lands from leasing by the enactment of appropriate legislation. If the Baucus bill should be enacted, the Bob Marshall, Scapegoat and Great Bear Wilderness areas would be withdrawn from all forms of mineral leasing as of May 21, 1981. If the bill fails to pass, these wilderness areas would be in the same position as other eongressionally designated wilderness areas and the Secretary could proceed in accordance with the policy set forth in his letters to the committee chairmen.
 

 VI.
 
 Constitutionality
 

 As stated above, questions relating to the necessity of reaching the constitutional issues and their resolution depend upon the interpretation and effect of section 204(e). I recognize that the court should not pass upon constitutional questions unless their adjudication is unavoidable and also that it is not the function of this court to give an advisory opinion. Nevertheless, in view of the unique situation presented, with a close question with regard to the proper interpretation of section 204(e) and the time restraints, I will address briefly the constitu
 
 *996
 
 tional issues and indicate my tentative conclusions.
 
 [37]
 

 A.
 
 Duration Established by Committee
 

 If section 204(e) were interpreted to authorize the Committee to dictate the scope and duration of an emergency withdrawal, I would be compelled by
 
 Chadha
 
 to declare it unconstitutional. In
 
 Chadha,
 
 the Executive branch of the Government, acting through an inquiry officer of the Immigration and Naturalization Service (INS), had conducted an administrative hearing on the deportation of Jagdish Rai Chadha. The officer determined that although Chadha was otherwise deportable, he should remain in the United States to avoid extreme hardship. Several months later, the House of Representatives passed a resolution pursuant to section 244(c)(2) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254(c)(2) (1976), which disapproved of the suspension of Chadha’s deportation and effectively ordered him to be deported.
 

 Chadha petitioned the Ninth Circuit Court of Appeals to review the constitutionality of section 244(c)(2) of the INA.
 
 [38]
 
 After a scholarly and detailed consideration of “the pertinent first principles of the constitution,” 634 F.2d at 420, the court held that section 244(c)(2) contravened the separation of powers doctrine and was therefore unconstitutional. The concern in
 
 Chadha,
 
 as here, was whether
 

 the legislature has undertaken to exercise a power necessarily but implicitly conferred elsewhere by the nature of an institutional government: power such as the executive authority faithfully to execute the laws, U.S.Const., art. II, § 3, and the judicial power to determine cases or controversies,
 
 id.,
 
 art. Ill, § 2.
 

 Id.
 
 at 421. As the court noted, determination of these issues is assisted by defining a constitutional violation of the separation of powers as
 

 an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government.
 

 Id.
 
 at 425. Section 204(e) fails this test for the same reasons section 244(c)(2) of the INA failed in
 
 Chadha.
 

 First, if section 204(e) is viewed as a device for correcting executive misapplication of a statute, the Committee “is performing a role ordinarily a judicial or an internal administrative responsibility.”
 
 Id.
 
 at 430.
 
 [39]
 
 As with section 244(c)(2) of the INA, this would disrupt the relationship between the judiciary and persons who could otherwise invoke its jurisdiction to review agency decisions. Individuals would no longer be “guaranteed the constraints of articulated reasons and stare decisis in the interpretation”,
 
 id.
 
 at 431, of wilderness, mining and mineral leasing, and other public lands legislation. Moreover, the integrity of the third branch would be undermined by the Committees’ power under section 204(e) to prevent the Judiciary’s review of Executive action under these statutes.
 
 *997
 
 There would be “virtually no procedural constraints on the ultimate [committee] decision nor any provision for review of [its] legal or factual conclusions.”
 
 Id.
 

 [40]
 

 Section 204(e) could also be viewed as a “means for sharing the administration” of wilderness and public lands statutes “with the Executive on an ongoing basis.”
 
 Id.
 
 at 429. In effect, the Committee would be filling “the interstices of statutory criteria and thereby supplementing] the Executive’s implementation of the statute.”
 
 Id.
 
 As noted in
 
 Chadha,
 
 however, “This addition of more precise statutory criteria on an accretive, case-by-case basis is, in short, law enforcement.”
 
 Id.
 
 at 431. (Footnotes omitted)
 
 [41]
 
 The proper development and execution of the administrative “process can be thwarted if legislative interference, constant in its potentiality, can be exercised in any given case without a change in the general standards the legislature has initially decreed.”
 
 Id.
 
 at 432.
 

 Finally, it might be argued that an unrestricted emergency withdrawal could be viewed as the “exercise of a residual legislative power . . . falling short of statutory amendment, which would, of course, require the observance of formal constitutional procedures for legislation.”
 
 Id.
 
 at 429. It is undisputed that the “Property Clause,” Article IV, Section 3, Clause 2, United States Constitution, entrusts Congress with complete power over the public lands.
 
 Kleppe v. New Mexico,
 
 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976). That power, however, is subject to the requirements of bicameralism, “one of the most fundamental of the checks of government power.”
 
 Chadha,
 
 634 F.2d at 434
 
 [42]
 

 Congress debated The Wilderness Act for eight years, spending much of that time working out a compromise between the congressional supporters of the conservationists and those of the mining industry. Only after prolonged consideration was the Act passed, with both Houses of Congress agreeing to leave wilderness areas open to mineral exploration and leasing for twenty years. That period ends on December 31, 1983, the same day the present withdrawal order ends. At the November 20, 1981 meeting of the House Committee Chairman Udail made the following comment with regard to a proposed resolution to require a three year emergency withdrawal of the entire wilderness system;
 

 Chairman Aspinall made a big compromise with the mining industry and agreed they would have 20 years.
 

 
 *998
 
 What we would be doing if you take that drastic action — without a day of • hearings, any consideration, any witnesses — you would be saying to the industry people, “We told you you could have 20 years. P.S. we have now decided that 18 is enough. Your time is up and it is all gone.”
 

 Tr. at 24-25.
 

 This comment is equally applicable to the May 21, 1981 resolution with regard to the Bob Marshall, Scapegoat and Great Bear Wilderness Areas. As noted above, all parties recognize that the Wilderness Act could be modified by appropriate legislation. But in this case, by a vote of 23 to 18, without hearings or testimony, one congressional committee would have effectively reversed a decision previously reached by the entire Congress and approved by the President. That would present a more serious violation of the separation of powers doctrine than did the one House resolution condemned in
 
 Chadha.
 

 [43]
 

 B.
 
 Duration Established by Secretary
 

 By interpreting section 204(e) to authorize the Secretary to establish the scope and duration of an emergency withdrawal, the constitutional infirmities discussed above are obviated. Since the Secretary’s exercise of discretion must be made pursuant to the goals and procedural requirements of the FLPMA, the terms of any emergency withdrawal will be subject to judicial review. The “constraints of articulated reasons and stare decisis,” 634 F.2d at 431, in the interpretation and application of section 204(e), as well as “provision for review of . . . legal or factual conclusions,”
 
 id.,
 
 would be guaranteed.
 

 Since the scope and duration of all emergency withdrawals must be determined by the Secretary, “legislative interference” could not “be exercised in any given case without a change in the general standards the legislation decreed.”
 
 Id.
 
 at 432. The “case-by-case . . . law enforcement,”
 
 id.
 
 at 431, would be performed by the Executive branch, as it should be.
 

 Finally, this interpretation of section 204(e) is properly described as allowing the “exercise of a residual legislative power... ”
 
 Id.
 
 at 429. Since an emergency withdrawal is implemented and can be revoked by the Secretary, acting pursuant to the guidelines of the FLPMA, the Committee’s action does not amount to a statutory amendment.
 

 Obviously, the authority vested in the Committee under even this limited interpretation is somewhat unique. It still requires the Executive branch to take affirmative action at the request of a single congressional committee. But since the Secretary is allowed to exercise his discretion in implementing that request, the Committee’s authority is sufficiently similar to traditional committee powers, n. 42,
 
 supra,
 
 and to proper report and wait provisions to pass constitutional muster.
 

 VII.
 
 Conclusions
 

 My conclusions may be summarized as follows:
 

 (1) Mountain States Legal Foundation, its members who hold noncompetitive lease applications in the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas, and the individual plaintiffs in Pacific Legal Foundation et al., who also hold lease applications, have standing to institute these actions. Pacific Legal Foundation as an or
 
 *999
 
 ganization lacks standing, but this is immaterial, as long as any plaintiff in that action has standing to seek the requested relief.
 

 (2) The actions present the necessary adversity and are ripe for judicial review.
 

 (3) The term “withdrawal”, as used in the Federal Land Policy and Management Act of 1976 (FLPMA), includes withdrawal of public lands from mineral exploration and leasing.
 

 .[15] (4) Section 204(e) of the FLPMA did not give the House Committee on Interior and Insular Affairs the power to direct the Secretary of the Interior to withdraw the three wilderness areas until January 1, 1984; and the Committee’s May 21, 1981 resolution impermissibly conflicts with section 4(d)(3) of the Wilderness Act of 1964, which permitted mineral exploration and leasing activities until that date.
 

 (5) The scope and duration of a withdrawal order under section 204(e) are within the sound discretion of the Secretary of the Interior, to be exercised in accordance with the goals and procedural requirements of the FLPMA, subject to judicial review. The Secretary has the power to revoke, after a reasonable time, a withdrawal order made at the request of either the House Committee on Interior and Insular Affairs or the Senate Committee on Energy and Natural Resources.
 

 (6) If section 204(e) were interpreted to permit a congressional committee, by majority vote, to direct the Secretary to withdraw wilderness areas until January 1, 1984, (in effect amending the Wilderness Act), the statute would be unconstitutional under the holding in
 
 Chadha v. Immigration and Naturalization Service,
 
 634 F.2d 408 (9 Cir. 1980), and other case law. Under the interpretation of section 204(e) set forth above as the conclusion of this court, there is no constitutional violation.
 

 (7) Legislation of the type of the Baucus bill, requiring action by both Houses of Congress and the President, is a proper method of determining whether section 4(d)(3) of the Wilderness Act should be amended.
 

 (8) The policy and procedures of the Department of the Interior as set forth in the letters dated November 19, 1981, from the Secretary to the chairmen of the two congressional committees are applicable to the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas, as well as the other congressionally-designated wilderness areas. The November 20 resolution of the House Committee on Interior and Insular Affairs is likewise applicable to the three wilderness areas involved in these actions.
 

 VIII.
 
 Remedy
 

 In view of the policy and procedures recently adopted by the Secretary of the Interior, as set forth in his letters of November 19, 1981, to the chairmen of the two congressional committees, and the resolution adopted on November 20, 1981, by the House Committee on Interior and Insular Affairs, it is deemed advisable to retain jurisdiction of these cases until July 1, 1982.
 
 [44]
 
 The Secretary should be given an opportunity to consider and process, within his discretion, the plaintiffs’ lease applications under the proper interpretation of section 204(e),
 
 [45]
 
 and pursuant to the current policies and procedures of the Department. See
 
 Arnold v. Morton,
 
 529 F.2d at 1105.
 

 Accordingly, IT IS ORDERED:
 

 (1) The Secretary of the Interior is directed to revoke Public Land Order No. 5952, issued on June 1, 1981 at the direction
 
 *1000
 
 of the House Committee on Interior and Insular Affairs, which withdrew the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas from mineral leasing until January 1, 1984.
 

 (2) The Secretary of the Interior, acting within his discretion, shall determine the scope and duration of the withdrawal of the three wilderness areas.
 

 (3) It is assumed that in the further handling of applications for noncompetitive oil and gas leases in these wilderness areas will follow the procedures set forth in his letters of November 19, 1981, to the chairmen of the House Committee on Interior and Insular Affairs and the Senate Committee on Energy and Natural Resources, for the handling of oil and gas leases on lands within the nation’s congressionally-designated wilderness areas.
 

 (4) This court will retain jurisdiction of these consolidated cases until July 1, 1982.
 

 [1]
 

 . The action by Pacific Legal Foundation against James G. Watt, as Secretary of the Interior, was filed in this court on June 4, 1981. In an amended complaint filed August 17, 1981, six “members and supporters” of Pacific Legal Foundation who hold applications for oil and gas leases in the three wilderness areas were added as parties plaintiff.
 

 The action by Mountain States Legal Foundation was filed in the United States District Court for the District of Colorado on June 3, 1981, and transferred to this court on July 14, 1981. John R. Brock, as Secretary of Agriculture, was also named as a defendant in this action.
 

 [2]
 

 . Lease applications involving lands under the management of the Forest Service are referred to the Forest Service for recommendations, and no action is taken until the Forest Service has completed the necessary environmental analysis and made its recommendations. The Wilderness Act makes the Secretary of Agriculture responsible for the conditions under which leasing takes place in wilderness areas. Section 4(d)(3), 16 U.S.C. § 1133(d)(3) (1976).
 

 [3]
 

 . The preparation of the EIS was terminated upon issuance of the withdrawal order. An affidavit of the Regional Forester states that by June 15, 1981, approximately 30% of the EIS had been completed and that public involvement was just beginning.
 

 [4]
 

 . Section 204(e) provides that:
 

 (e) When the Secretary determines, or when the Committee on Interior and Insular Affairs of either the House of Representatives or the Senate notifies the Secretary, ■ that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost, the Secretary, notwithstanding the provisions of subsection (c)(1) and (d) of this section, shall immediately make a withdrawal and file notice of such withdrawal with the Committee on Interior and Insular Affairs of the Senate and the House of Representatives. Such emergency withdrawal shall be effective when made but shall last only for a period not to exceed three years and may not be extended except under the provisions of subsection (c)(1) or (d), whichever is applicable, and (b)(1) of this section. The information in subsection (c)(2) of this subsection shall be furnished the committees within three months after filing such notice.
 

 43 U.S.C. § 1714(e) (1976).
 

 [5]
 

 . The Senate Committee on Interior and Insular Affairs was replaced by the Committee on Energy and Natural Resources, effective February 11, 1977.
 

 [6]
 

 . The hearing consisted of a debate among the members of the Committee with respect to the propriety of the resolution. No testimony or documentary evidence was presented to the Committee.
 

 [7]
 

 . Section 204(c)(2) specifies 12 items which the Secretary must furnish to the Committees “within three months after filing the notice under subsection (e) ... ”. 43 U.S.C. § 1714(c)(2).
 

 [8]
 

 . Specifically he considered the constitutionality of the action he was required to take “highly questionable, the directive being in the form of a committee resolution, passed by a simple majority of the members of but a single committee of only one House of the Congress. . . . ”
 

 [9]
 

 . Section 4(d)(3) of the National Wilderness Preservation Act provides that wilderness areas are subject to the provisions of the mining and mineral leasing laws, the same as most federally-owned lands, until midnight December 31, 1983, subject to conditions therein specified. 16 U.S.C. § 1133(d)(3) (1976).
 

 [10]
 

 . The Secretary’s letter reads:
 

 You and I share a mutual desire to encourage the wisest possible management of America’s 80 million acres of National Wilderness Areas, which, together with our national public lands and wildlife refuges, comprise a priceless heritage of which every American can be enormously proud. There are no other places like them on earth, and I am dedicated to their protection.
 

 In order that the public and their elected representatives will have full opportunity to participate in the process that takes place when lease applications affecting wilderness areas are considered, I am immediately instructing appropriate agencies within the Department of the Interior to conform their procedures and actions to the following policies:
 

 (1) No lease application affecting lands within a Congressionally-designated unit of the national wilderness system may be processed unless it has first been the subject of an environmental assessment or, where appropriate, an environmental impact statement, prepared by the responsible surface management agency. Further, the environmental assessment or EIS process must have allowed for at least one public hearing, and adequate opportunity for public notification and participation.
 

 (2) Henceforward, the Department of the Interior will provide written notice to Congress at least 30 legislative days, or no more than 60 calendar days, in advance of any action to grant lease or leases in a Congressionally-designated wilderness unit. This notice will be provided to the Chairmen and Ranking Minority Members of the House Committee on Interior and Insular Affairs and the Senate Committee on Energy and Natural Resources, and to the Senators and Representatives from the state in which the affected wilderness unit is located.
 

 As you know, Section 4(d)(3) of the National Wilderness Preservation Act, enacted in 1964, specifies that wilderness areas are subject to the provisions of the mining and mineral leasing laws, the same as most other federally-owned lands, until January 1, 1984. I know you are also aware that numerous lease applications affecting wilderness lands are currently pending, and that I am obligated to consider these applications in accordance with the provisions of the Wilderness Act and the mining and mineral leasing laws. I am aware of the controversy that has been generated in several areas where lease applications are pending, and it is my expectation
 
 *983
 
 that the new procedures I have outlined in this letter will enable the public and members of Congress to participate to a greater degree in the challenging and often difficult process of formulating decisions which conform to these laws, while still affording maximum protection to our wilderness areas.
 

 For the record, it should be noted that there have been no leases granted for exploration or drilling in the wilderness areas, nor have Environmental Impact Statements been presented to the Secretary of the Interior for decision. Much misinformation has been sent out concerning the Bob Marshall Wilderness Area. There never was an EIS presented to the Secretary of the Interior on the BMWA and there has been no call for a decision concerning leasing in that area since taking office.
 

 [11]
 

 . Pacific Legal Foundation also invokes jurisdiction under 28 U.S.C. § 1346(a)(2) (1976). This section, however, provides jurisdiction only for suits for money damages, not for the declaratory and injunctive relief sought here.
 

 [12]
 

 . The standing determination in suits brought under the Administrative Procedure Act is made in accordance with section 10 of the Act, which encompasses the
 
 Warth v. Seldin
 
 requirement. Section 10 provides: “A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” 5 U.S.C. § 702 (1976).
 

 [13]
 

 . In a letter dated October 5, 1981, the Bureau of Land Management notified Ida Lee Anderson, one of the members of MSLF holding a lease application, that lands within the Great Bear Wilderness Area were suspended because they were withdrawn from leasing by Public Land Order No. 5952 effective June 1, 1981 and that the withdrawal will remain in effect until January 1, 1984.
 

 43 C.F.R. § 2091.1 (1980) provides that applications which are accepted for filing must be rejected and cannot be held pending possible future availability of the land or interests in land, when approval of the applications is prevented by: (a) Withdrawal ... of the lands....
 

 The Secretary of the Interior has admitted that
 

 1. Since 1976, the Montana State Office of the Bureau of Land Management has rarely (less than 10% of the time) denied noncompetitive oil and gas lease applications filed for federal lands within the state of Montana.
 

 2. Upon publication in the Federal Register of a public land order withdrawing public lands from oil and gas leasing, the usual practice for the office of the Bureau of Land Management in the state in which the withdrawn lands are located would be to indicate, on the oil and gas plats kept by that office, the boundaries of the withdrawn area and to notify lease applicants in the withdrawn area that their applications had been rejected.
 

 3. No action to formally reject the noncompetitive oil and gas lease applications pending in the Areas is presently being taken due to the pendency of the above-captioned litigation.
 

 It seems evident that absent this litigation, the lease application would have been summarily rejected as a result of the withdrawal order. The letter to Ida Lee Anderson states that the withdrawal will remain in effect until January 1, 1984 — the date when the lands will be permanently withdrawn by operation of section 4(d)(3) of the Wilderness Act. 16 U.S.C. § 1133(d)(3) (1976). The “suspension” is therefore tantamount to a rejection for purposes of this litigation.
 

 [14]
 

 . 30 U.S.C. § 226 (1976) establishes the rights of both “competitive” and “noncompetitive” lease applicants. Under subsection (a) the Secretary has discretion either to issue or refuse to issue oil and gas leases.
 
 Udali v. Tallman,
 
 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965);
 
 Burglin v. Morton,
 
 527 F.2d 486, 488 (9 Cir. 1976),
 
 cert. denied,
 
 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976). Subsections (b) and (c) make it “mandatory . . . who is to get the lease if it is decided that a lease will be
 
 *985
 
 issued — if there is a known geologic structure, the highest bidder [competitive lease]; if not, the applicant first in line [noncompetitive lease].”
 
 Duesing v. Udall,
 
 350 F.2d 748, 750 (D.C.Cir.1965), cert.
 
 denied,
 
 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966);
 
 Burglin,
 
 527 F.2d at 488.
 

 [15]
 

 . At the time
 
 Krueger
 
 was decided, 30 U.S.C. § 201(b) (1970) provided:
 

 Where prospecting or exploratory work is necessary to determine the existence or workability of coal deposits in any unclaimed, undeveloped area, the Secretary of the Interior
 
 may issue,
 
 to applicants qualified under this chapter prospecting permits for a term of two years.... (Emphasis added).
 

 Compare with 30 U.S.C. § 226(a) (1976):
 

 All lands subject to disposition under this Act which are known or believed to contain oil or gas may
 
 be leased
 
 by the Secretary. (Emphasis added).
 

 This statutory language indicates that until the Secretary stopped issuing prospecting permits in 1973 (Prospecting Permits for Coal: Limitation of Issuance Order No. 2952, 38 Fed. Reg. 4682 (1973)), he had the same discretion to issue them as he presently has for oil and gas leases. As noted in
 
 Natural Resource Defense Council, Inc.
 
 v.
 
 Berklund,
 
 609 F.2d 553, 555 n. 5 (D.C.Cir.1979), “The Department of Interior, throughout the 58 years of administration of these provisions, has consistently interpreted § 201(b) as giving the Secretary discretion in granting of the prospecting permits. ...”
 

 Since the Secretary has the same discretion in the issuance of oil and gas leases, the due process rights accruing to the applicants would also be the same.
 
 Krueger’s
 
 treatment of standing accordingly supports plaintiffs’ standing.
 
 Accord, Mountain States Legal Foundation v.
 
 Andrus, 499 F.Supp. 383, 396 (D.Wyo. 1980).
 

 [16]
 

 . The cases cited by defendants to the contrary are either inapplicable or factually distinguishable. In
 
 Rowe v. United States,
 
 464 F.Supp. 1060 (D.Alaska 1979),
 
 modified,
 
 633 F.2d 799 (9 Cir. 1980),
 
 cert. denied,
 
 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981), the court’s reservations about the plaintiffs’ standing were directed at only one of several statutory challenges. Despite the standing question even that challenge was rejected on the merits. With regard to the other challenges, the court’s discussion of the “right to fair consideration recognized in
 
 Schraier'', id.
 
 at 1071, lends support to plaintiffs’ standing argument in the present case.
 

 Although
 
 McTiernan v. Franklin,
 
 508 F.2d 885 (10 Cir. 1975) held that the plaintiff lacked standing “to question title to the mineral rights”,
 
 id. at 888,
 
 it said nothing about standing to question an abuse of due process in considering lease applications.
 

 The plaintiff in
 
 Pullman v. Chomey,
 
 509 F.Supp. 162 (D.Colo.1981), was denied standing only because he failed to establish “the requisite connection between the claimed injury and the challenged conduct....”
 
 Id.
 
 at 166-67. There is no such failure in this case.
 

 [17]
 

 . Since standing is properly based on due process grounds, it is not necessary to address plaintiff PLF’s third alleged injury, that of pecuniary loss in the market value of the lease applications.
 

 [18]
 

 . As of June 5, 1981, eight specified members of MSFL, including Ida Lee Anderson (see n. 13, supra), held noncompetitive oil and gas lease applications in the affected wilderness areas. The Bob Marshall Alliance and the Wilderness Society claim defects in the applications and membership status of three of the members. The claims are supported by incomplete regulatory citations and a disputable interpretation of the members’ depositions. In any event, MSFL’s standing may be based on the interests of the remaining members. It is “unnecessary to examine the standing of all [plaintiffs] so long as one had standing to secure the requested relief.”
 
 Legal Aid Society of Alameda County v. Brennan,
 
 608 F.2d 1319, 1334 (9 Cir. 1979);
 
 Watt v. Energy Action Educational Foundation,
 
 -U.S. -, 102 S.Ct. 205,212,70 L.Ed.2d 309 (1981).
 

 [19]
 

 . See also
 
 Pacific Legal Foundation v. State Energy
 
 Resources Conservation
 
 & Development Commission,
 
 659 F.2d 903, 909 (9 Cir. 1981).
 

 [20]
 

 . If it were necessary to pass on the political question doctrine, I would follow
 
 Chadha.
 
 Plaintiffs’ constitutional “claim is not that Congress has violated [the Property Clause; their] claim is that [§ 204(e)] violates the separation of powers doctrine. ... It is the Judiciary’s prerogative, after a showing that the source of a claimant’s appeal is not textually committed to another branch, to adjudicate a claimed excess by a coordinate branch of its constitutional powers.” 634 F.2d at 419.
 

 [21]
 

 . As noted in
 
 Chadha:
 

 If the doctrine [of separation of powers] is given this competitive test, it might be implied that the proper remedy for a violation lies in the branch encroached upon. Under this view one can argue that an executive agency can defy an attempt by another branch to exercise a prerogative of the former. Even from the standpoint of abstract logic, however, the solution is not sound because stalemate is the end result, and certainly our constitutional tradition is otherwise.
 

 634 F.2d at 423. (Footnote omitted.)
 

 [22]
 

 . The last part of the
 
 Chadha
 
 analysis on the adverseness issue is likewise on point:
 

 Finally, if we accepted amici’s argument and dismissed the appeal for lack of adversity, we would implicitly approve the untenable result that all agencies could insulate unconstitutional orders and procedures from appellate review simply by agreeing that what they did was unconstitutional. Where, as here, the agency fully intends to enforce its order, it would be a perversion of the judicial process to dismiss the appeal and thereby permit the order to be enforced on such grounds.
 

 634 F.2d at 420. (Footnote omitted).
 

 [23]
 

 . As noted above, under the House Resolution and Order No. 5952, the withdrawal will remain in effect until January 1, 1984, when the wilderness areas will be withdrawn by operation of the Wilderness Act. In other words, if the resolution and order are effective, there are no further administrative remedies to exhaust.
 

 [24]
 

 . 16 U.S.C. § 1133(d)(3) (1976) provides in relevant part:
 

 Mining and mineral leasing laws; leases, permits, and licenses; withdrawal of minerals from appropriation and disposition. Notwithstanding any other provisions of this chapter, until midnight December 31, 1983, the United States mining laws and all laws pertaining to mineral leasing shall, to the same extent as applicable prior to September 3, 1964, extend to those national forest lands designated by this chapter as “wilderness areas”.... Subject to valid rights then existing, effective January 1, 1984, the minerals in lands designated by this chapter as wilderness areas are withdrawn from all forms of appropriation under the mining laws and from disposition under all laws pertaining to mineral leasing and all amendments thereto.
 

 [25]
 

 . 16 U.S.C. § 1280(a) (1976) provides in relevant part:
 

 (a) Nothing in this chapter shall affect the applicability of the United States mining and mineral leasing laws within components of the national wild and scenic rivers system except that—
 

 (iii) subject to valid existing rights, the minerals in Federal lands which are part of the system and constitute the bed or bank or are situated within one-quarter mile of the bank of any river designated a wild river under this chapter or any subsequent Act are hereby withdrawn from all forms of appropriation under the mining laws and from operation of the mineral leasing laws including, in both cases, amendments thereto.
 

 [26]
 

 . Management decisions may include “exclusions (that is, total elimination) of one or more of the principal or major uses ...” of an area of land. 43 U.S.C. § 1712(e) (1976). “Principal or major uses” is defined to include “mineral exploration and production.. .. ” 43 U.S.C. § 1702(1) (1976).
 

 [27]
 

 . Executive Order No. 8979 used similar language:
 

 None of the above-described lands excepting [a described area] shall be subject to settlement, location, sale, or entry, or other disposition (except for fish trap sites) under any of the public-land laws applicable to Alaska....
 

 380 U.S. at 19, 85 S.Ct. at 802.
 

 [28]
 

 . 43 U.S.C. § 1702(j) (1976) provides in relevant part:
 

 (j) The term “withdrawal” means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program. . . .
 

 [29]
 

 . In support of his restrictive interpretation of a “withdrawal”, the Secretary also quotes language from a letter from Interior Assistant Secretary Horton to the House Interior Committee. The letter was written prior to the enactment of the FLPMA to clarify the meaning of “withdrawal”. It appears that the word “traditional” was used in that letter to distinguish between the term’s traditional meaning (withholding from settlement, sale, location or entry .. .) and a proposed new meaning which would also allow exclusion from management under principles of multiple use. See H.Rep.No.94-1163, 94th Cong. 2nd Sess. 44 (1976) reprinted in 5 U.S.Code Cong. & Admin.News 6218 (1976). Despite its reference to
 
 Udall v. Tallman,
 
 the letter does not support the Secretary’s interpretation.
 

 [30]
 

 . At oral argument counsel for The Bob Marshall Alliance and The Wilderness Society gave qualified support to this position, stating that “The Secretary may not revoke before a reasonable time has elapsed to allow Congress to legislate.” The federal defendants and Sierra Club contend that the Secretary has no authority under section 204(e) to revoke the withdrawal order. They do not, of course, agree with respect to the constitutionality of this section. Mountain States Legal Foundation did not expressly consider the right of the Secretary to revoke the order but does argue that regardless of any revocation the court must reach the. constitutional issues.
 

 [31]
 

 . At oral argument counsel for the House Committee on Interior and Insular Affairs said in part: “I think that at the time the Committee believed in good faith in the deadline it established. I don’t think the Committee is adamant on that point. 1 think that the Committee expects the Secretary to exercise his discretion in that regard, and that the nature of this process is such that the Committee will and has negotiated with the Secretary on withdrawal of wilderness areas.”
 

 [32]
 

 . The letter from Chairman Udall stated in part:
 

 [I]n view of the most recent selections filed by the State of Alaska, its new lawsuit and its threat to seek immediate judicial remedies to prevent administrative actions to protect these lands, I must emphasize to you, on behalf of the Committee on Interior and Insular Affairs of the U.S. House of Representatives that an emergency exists with respect to the national interest lands. Extraordinary measures must be taken now to assure the preservation of the important values in these lands, which will be lost if such measures are not promptly effected. We urge you to exercise your authority under section 204(e) of the Federal Land Policy and Management Act of 1976 immediately to assure that these significant values are saved.
 

 462 F.Supp. at 1158 n. 5. Neither the validity of the Committee’s action nor the constitutionality of section 204(e) were considered in this case.
 

 [33]
 

 . On May 2, 1979, the Committee resolved “that it seeks the immediate withdrawal of [the watershed lands] from all forms of appropriation under the public land laws, including the mining laws but not mineral leasing laws, subject to valid existing rights.” Resolution of the Committee on Interior and Insular Affairs, United States House of Representatives, May 2, 1979.
 

 [34]
 

 . Public Land Order No. 5653 as amended by Public Land Order No. 5654 (Alaska Lands); Public Land Order No. 5662 (Casitas Reservoir Watershed).
 

 [35]
 

 . The parties recognize, as does the court, the problems presented in determining how long the Secretary must maintain an order before exercising his discretion to revoke the order. The parties and
 
 amici
 
 who support this discretionary power agree that it should not be exercised until a “reasonable time” has elapsed. Since this issue is not presently before the court, it is not necessary to fix a specific time. It does seem reasonable, however, that the withdrawal remain in effect at least until the reports required by section 204(e) are filed with the committees.
 

 [36]
 

 . It is argued that if a withdrawal order is in effect even one hour, 43 C.F.R. § 2091.1 (1980),
 
 supra,
 
 requires the immediate rejection of all pending lease applications. Previous agency action indicates that this is not necessarily the case. As noted in
 
 Georgette B. Lee,
 
 10 I.B.L.A. 23, 26 (1973), the purpose of the “rejection rule” is to prevent “the public land records from being burdened with thousands of applications on which there is no possibility that action can be taken in the foreseeable future. ...” By its nature, an emergency withdrawal is temporary, never exceeding three years. Absent intervening legislation, it is therefore a certainty that “action will be taken in the foreseeable future.. . . ” Mechanical application of 43 C.F.R. § 2091.1 does not seem to be required in an emergency withdrawal situation.
 

 [37]
 

 . ' If I am correct in my conclusion with respect to the interpretation and effect of section 204(e), it is, of course, unnecessary to reach the question of its constitutionality. If I am wrong and MSLF and the federal defendants have correctly interpreted the section, it would be necessary to resolve the constitutional issues.
 

 [38]
 

 . The case presented a novel question, for as Judge Kennedy noted: “no circuit or Supreme Court authority we have found holds that the Legislature has impermissibly invaded the prerogative of the Executive or the Judiciary absent a clause in the constitution which confers the power upon another branch with great specificity.” 634 F.2d at 420.
 

 [39]
 

 . The minutes of the May 21 meeting indicate ■ that a majority of the Committee believed that the Department of the Interior “would not sanction de facto withdrawal" and would “proceed to consider and issue leases in these wilderness areas, the ones we are considering, unless we act formally to withdraw.” (Representative Seiberling, Transcript of May 21 meeting at 36). Chairman Udall stated: “It is our job to ride herd on them to make sure that whoever is in power, to make sure the statutes are enforced.”
 
 ¡d.
 
 at 45.
 

 [40]
 

 . At the Committee meeting on November 20 Chairman Udail in referring to the May 21 meeting said in part;
 

 Here was the Secretary of Interior — with no hearings, no warning to the local people, the local congressmen, anyone else — going to permit exploration in the oldest and some think probably the best of all of our wilderness areas.
 

 On the other hand, we were coming back with a blunderbuss and saying without any hearings, without any testimony before this committee, we proposed to declare an emergency and lock up for three years any further exploration in those wilderness areas.
 

 It seemed to me that both actions go a little bit too far,
 

 Tr. November 20 meeting at pg. 23.
 

 [41]
 

 . One supporter of the May 21 resolution, Representative Seiberling (also Chairman of the House Subcommittee on Public Lands and National Parks), said that he thought “this committee has a right to participate in those [the Secretary’s] decisions and get in on the take off before we have to get in on the crash landing. That is what this resolution indicates we wish to do.” Tr. 32. Another member of the Committee, however, expressed the following concern: “By passing this resolution it seems to me ... that we are serving notice to the American public that Congress wishes to reserve the right to reconsider the legislation it has enacted on a case by case basis as if it were an administrative body or court.” Tr. 61.
 

 [42]
 

 . The principle that the House, the Senate, and their committees may independently exercise authority ancillary to legislation, e.g., committee power to investigate and subpoena witnesses,
 
 McGrain v. Daugherty,
 
 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927); committee power to decide which bills to take up and consider, and when to report matters to the floor,
 
 Atkins v. United States,
 
 556 F.2d 1028, 1062, 214 Ct.Cl. 186 (1977), cert.
 
 denied,
 
 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); committee power to obtain immunity orders,
 
 United States v. Romano,
 
 583 F.2d 1, 4 (1 Cir. 1978); committee approval of acquisitions by Park Service,
 
 United States v. 0.37 Acres of Land, More or Less,
 
 414 F.Supp. 470, 472 (D.Mont. 1976), is likewise limited by fundamental constitutional constraints.
 

 [43]
 

 . Plaintiffs and the Secretary argue that if section 204(e) is interpreted to authorize the Committee to determine the duration of a withdrawal, it is also unconstitutional as a violation of the presentment, appointments, disabilities and incompatibility clauses of the Constitution. Although these arguments have merit, it is unnecessary to discuss them because of the interpretation given to the statute.
 

 Intervening defendants and
 
 amici
 
 argue that even if section 204(e) is interpreted to authorize the Committee to determine the duration of a withdrawal, it is constitutional as a legitimate “report and wait” provision. Report and wait provisions are enacted by both Houses, not a single committee. Furthermore, they preserve the status quo by deferring administrative action. The Committee’s resolution, however, mandated administrative action, changing both the status of the lands and the Secretary’s authority over them.
 

 [44]
 

 . It seems probable that by July 1, 1982, the Supreme Court will have decided
 
 Chadha,
 
 and Congress may have acted on the Baucus bill. Moreover, as noted above, it seems probable also that the Secretary of the Interior will comply with the request of the House Committee to refrain from issuing mineral leases in congressionally designated wilderness areas until June 1, 1982.
 

 [45]
 

 . As set forth above, the Secretary has taken the position that while he questioned the statutory and constitutional power of the House Committee to direct the issuance of Public Land Order No. 5952, he was required to withdraw the lands pursuant to the Committee’s directive without exercising any discretion as to the duration of the withdrawal. This was based on an incorrect interpretation of section 204(e).